## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TOBIN DOLAN; LYDIA DOLAN; TANGEE
DOLAN; DOROTHY JONES; BRIAN
RODGERS; BARBARA RODGERS;
MICHAEL SALAZAR; REYNALDO
HERRERA; and KATHY VALERA,

          Plaintiffs,

vs.                                        No. CV 23-00908 JB/JFR

FEDERAL EMERGENCY MANAGEMENT
AGENCY,

          Defendant.

-- and --

MARIANNA LANDS and CHARLES
WILLIAM PAYNTER;

          Plaintiffs,

vs.                                        No. CV 23-00869 JB/JFR

FEDERAL EMERGENCY MANAGEMENT
AGENCY; DEANNE CRISWELL, as
Administrator of FEMA; and ANGELA
GLADWELL,

          Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Opening Brief, filed July

29, 2024, (23-0908 Doc. 44)("<u>Dolan</u> Motion"); and (ii) the Opening Brief of Plaintiffs Marianna

Lands and Charles Payner, filed July 17, 2024 (23-00869 Doc. 41)("<u>Lands</u> Motion").  The Court

held a hearing on October 15, 2024.  <u>See</u> Rough Transcript of Hearing at 1:13-14, taken October

15, 2024 (Court)("Rough Tr.").[1]  The primary issues are: (i) whether the Hermit's Peak Fire

Assistance Act, Pub. L. No. 117-180, § 104, 136 Stat. 2114, 2168 (2022)("Hermit's Peak Act")

allows victims of the Hermit's Peak/Calf Canyon Fire to recover noneconomic damages for

discomfort, annoyance, inconvenience, and emotional distress under New Mexico State law; and

(ii) whether the Defendant Federal Emergency Management Agency's ("FEMA's") refusal to

compensate noneconomic damages under the Hermit's Peak Act is arbitrary or capricious in

violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  The Court concludes that:

(i) the Hermit's Peak Act waives FEMA's sovereign immunity for claims pursuing damages

resulting from the Hermit's Peak/Calf Canyon Fire that are available under New Mexico State law;

(ii) New Mexico State law allows victims of the Hermit's Peak/Calf Canyon Fire to recover

noneconomic damages for nuisance, trespass, and personal injury, such as damages for emotional

distress, discomfort, annoyance, and inconvenience; (iii) the correct interpretation of the "actual

compensatory damages" recoverable in the Hermit's Peak Act's includes noneconomic damages;

and (iv) FEMA's refusal to award noneconomic damages under the Hermit's Peak Act is arbitrary

and capricious in violation of the APA; and (v) the Court compels FEMA to award noneconomic

damages under the APA.

## FACTUAL BACKGROUND

The Court first summarizes the history of the Hermit's Peak/Calf Canyon Fire, describes

the Hermit's Peak Act and FEMA's promulgated regulations, and then describes the Plaintiffs and

their injuries resulting from the fire.

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

1.    <u>**The Hermit's Peak/Calf Canyon Fire**</u>.

In April 2022, a wildfire scorched over 340,000 acres of land in northeastern New Mexico, destroying over 900 structures, and forcing the evacuation of over 15,000 households throughout Mora, San Miguel and Taos Counties.  <u>See</u> Patrick Lohmann, Were You Affected by the Massive Wildfire in Northern New Mexico?  We Want to Hear From You, Were You Affected by the Massive Wildfire in Northern New Mexico? We Want to Hear From You (Mar. 2, 2023), https://www.propublica.org/getinvolved/new-mexico-wildfires-hermits-peak-calf-canyon    (last accessed December 6, 2024).  It is the largest wildfire in New Mexico State history.  <u>See</u> Bryan Pietsch and Jason Samenow, <u>New Mexico blaze is now largest wildfire in state history</u>, The Washington Post (May 17, 2022), https:(ww.washingtonpost.com/nation/2022/05/17/calf-canyon-hermits-peak-fire-new-mexico/ (last accessed December 5, 2024).  The first wildfire began on April 6, 2022, in Hermit's Peak, New Mexico, when the United States Forest Service ("Forest Service") initiated a prescribed burn in the Santa Fe National Forest in San Miguel County that quickly spread beyond federal land and turned into a wildfire.  <u>See</u> Hermit's Peak Act § 102(a) Findings and Purposes, 136 Stat. 2144, 2168 ("Hermit's Peak Act § 102(a)").  A second wildfire began on April 19, 2022, in Calf Canyon, New Mexico, when a dormant pile burn[2] from the prior winter re-emerged.  <u>See</u> Hermit's Peak Act § 102(a).  Within the same month, on April 27, 2022, the wildfires at Hermit's Peak and Calf Canyon merged and formed the Hermit's Peak/Calf Canyon Fire.  <u>See</u> Hermit's Peak Act § 102(a).  By May 2022, the Hermit's Peak/Calf Canyon Fire caused evacuations in multiple villages and communities, including San Miguel county jail,

---

[2]A pile burn "is a type of prescribed fire where firefighters pile and burn forest debris to reduce an area's wildfire risk."    Pile Burning, United States Forest Service, https://www.fs.usda.gov/detail/arp/landmanagement/resourcemanagement/?cid=fsm91_058291 (last accessed Dec. 6, 2024).

the State's psychiatric hospital, the United World College, and New Mexico Highlands University.
See Hermit's Peak Act § 102(a).  At the request of New Mexico Governor Michelle Lujan
Grisham, President Joseph R. Biden issued a major disaster declaration for the counties of Colfax,
Mora, and San Miguel.  See Hermit's Peak Act § 102(a); Hermit's Peak/Calf Canyon Fire
Assistance, 88 Fed. Reg. 33808 (August 29, 2023)(codified at 44 C.F.R. 296).  The Forest Service
fully contained the Hermit's Peak/Calf Canyon Fire four months later, in August 2022.  See The
New Mexican, Hermits Peak/Calf Canyon Fire 100 percent contained, fire officials say (August
21, 2022), https://www.santafenewmexican.com/news/local_news/hermits-peak-calf-canyon-fire-
100-percent-contained-fire-officials-say/article_5ac054fc-21a1-11ed-9401-134e852ee0a8.html
(last visited December 6, 2024).  The Forest Service assumes responsibility for the Hermit's
Peak/Calf Canyon Fire.  See Hermit's Peak Act § 102(a).

    2.    **The Hermit's Peak Act**.

    In September 2022, Congress established a dedicated relief fund to compensate victims of
the Hermit's Peak/Calf Canyon Fire by enacting the Hermit's Peak Act.  See Hermit's Peak Act §
102(b), 136 Stat. at 2169 ("§ 102(b)").  The Hermit's Peak Act has two stated purposes: "(1) to
compensate the victims of the Hermit's Peak/Calf Canyon Fire, for injuries resulting from the fire;
and (2) to provide for the expeditious consideration and settlement of claims for those injuries."
Hermit's Peak Act § 102(b).  The Hermit's Peak Act defines injury using the Federal Tort Claim
Act's ("FTCA's") definition, which is "injury or loss of property or personal injury or death."
Hermit's Peak Act § 103(5), 136 Stat. at 2169 (citing FTCA 28 U.S.C. § 1346(b)(1)).  The section
of the Hermit's Peak Act at issue in this case is the section that provides compensation for victims
of the Hermit's Peak/Calf Canyon Fire.  See Hermit's Peak Act § 104, 136 Stat. at 2170-76 ("§

104"). Section 104 has several key provisions that are important to determining whether the

Plaintiffs can recover emotional damages.

The first key provision governs the applicability of state law:

(2)    APPLICABILITY OF STATE LAW. -- Except as otherwise provided in this Act, the laws of the State of New Mexico shall apply to the calculation of damages under subsection (d)(4).

Hermit's Peak Act § 104(c)(2). The Court hereinafter refers to § 104(c)(2) as the "NM State law

provision." The second key provision governs the extent of damages:

(3)    EXTENT OF DAMAGES. -- Any payment under this Act --

(A)    shall be limited to actual compensatory damages measured by injuries suffered; and

(B)    shall not include --

(i)    interest before settlement or payment of a claim; or

(ii)    punitive damages.

Hermit's Peak Act § 104(c)(3). The Court hereinafter refers to § 104(c)(3) as the "Extent of

Damages provision." The third key provision governs allowable damages:

(4)    ALLOWABLE DAMAGES. --

(A)    LOSS OF PROPERTY. -- A claim that is paid for loss of property under this Act may include otherwise uncompensated damages resulting from the Hermit's Peak/Calf Canyon Fire for --

[. . .]

(vi)    any other loss that the Administrator determines to be appropriate for inclusion as loss of property.

(B)    BUSINESS LOSS. -- A claim that is paid for injury under this Act may include damages resulting from the Hermit's Peak/Calf Canyon Fire for the following types of otherwise uncompensated business loss:

[. . .]

> (vi)   Any other loss that the Administrator determines to be appropriate for inclusion as business loss.

Hermit's Peak Act § 104(d)(4)(B).  Section 104(d)(4)(C) similarly states:

> (C)   FINANCIAL LOSS. -- A claim that is paid for injury under this Act may include damages resulting from the Hermit's Peak/Calf Canyon Fire for the following types of otherwise uncompensated financial loss:
>
> [. . .]
>
> (x)   Any other loss that the Administrator determines to be appropriate for inclusion as financial loss.

Hermit's Peak Act § 104(d)(4)(A)-(C).   The Court hereinafter refers to Hermit's Peak Act § 104(d)(4)(A)-(C) as the "Allowable Damages -- Property, Business, and Financial Loss provision."

Two final provisions are relevant to demonstrate the relationship between the Hermit's Peak Act and the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680 ("FTCA").   First, acceptance of payment under the Hermit's Peak Act constitutes a "complete release of all claims against the United States" under the FTCA "or any other Federal or State law, arising out of or relating to the same subject matter."   Hermit's Peak Act § 104(e)(2).   Second, an injured person may seek compensation either by submitting a claim under the Hermit's Peak Act, or by filing a claim under the Federal Tort Claims Act.   <u>See</u> Hermit's Peak Act § 104(h)(1).   The Court hereinafter refers to § 104(e)(2) and § 104(h)(1) as the "Federal Tort Claims Act provisions."

### a.   <u>The Cerro Grande Fire Assistance Act</u>.

The Hermit's Peak Act's language is nearly identical to the 2001 Cerro Grande Fire Assistance Act, Pub. L. 106-246, 114 Stat. 584 (2001)("Cerro Grande Fire Act"), which Congress

enacted following the Cerro Grande Fire in New Mexico in 2000.[3]  See 88 Fed. Reg. 59730, 59730.

The Cerro Grande Fire took place on May 4, 2000, when a National Park Service's prescribed fire

ignited at the Bandelier National Monument, New Mexico.  See 88 Fed. Reg. 59730 at n.1.  The

Cerro Grande Fire burned approximately 47,750 acres and destroyed over 200 residential

structures.  See 88 Fed. Reg. 59730 at n.1.  Congress then passed the Cerro Grande Fire Act, which

required FEMA to manage a program to fully compensate those who suffered injuries resulting

from the Cerro Grande Fire.  See 88 Fed. Reg. 59730 at n.1.  FEMA then promulgated regulations,

which were codified in 44 C.F.R § 295 ("Cerro Grande Fire Regulations").

    3.    **The FEMA Regulations.**

        a.    **The Interim Final Rule and Public Comment on Recovery of Noneconomic Damages.**

The Hermit's Peak Act also directed FEMA's Administrator to promulgate regulations for

the processing and payment of claims.  See Hermit's Peak Act § 104(f)(1).  On November 14,

2022, FEMA published an interim final rule.  FEMA received public comment on the interim final

rule, which included discussion about the availability of non-economic damages.  See 88 Fed. Reg.

59732, 59767.  FEMA's response to such comments was that the Hermit's Peak Act's damages

provisions exclude non-economic damages:

> FEMA recognizes the significant injuries suffered by claimants and the long-term recovery needed for the communities impacted by the Fire.  The Act at section 104(c)(3)(A) limits payment to "actual compensatory damages measured by injuries suffered."  Section 104(d) of the Act limits allowable damages to uncompensated damages for loss of property, business loss, and financial loss; and therefore, limits the actual compensatory damages FEMA may provide to economic damages.  This limitation of the Act with respect to allowable damages excludes non-economic damages such as pain and suffering.  FEMA recognizes that making people whole for the full scope of loss after a devastating fire may not be possible.

---

[3]

> The Act authorizes payment of damages, and money cannot restore the full array of the human experience.

88 Fed. Reg. 59743.  In response to other comments, FEMA similarly states that the Hermit's Peak Act does not allow claimants to recover for nuisance and trespass damages under New Mexico law, because such damages are noneconomic, see 88 Fed. Reg. 59743, and that the Hermit's Peak Act does not allow claimants to recover for "emotional distress, disturbance, and annoyance," because such damages are noneconomic, 88 Fed. Reg. 59744.

### b.    The Final Hermit's Peak Regulations.

FEMA published its final regulations on August 29, 2023.  See 44 C.F.R. § 296 ("Hermit's Peak Regulations").  The Hermit's Peak Regulations state that the purpose of the Hermit's Peak Act is to "receive, evaluate, process, and pay actual compensatory damages for injuries resulting from the Hermit's Peak/Calf Canyon Fire."  44 C.F.R § 296.1.  To receive compensation, a claimant "must be an Injured Person who suffered injury as a result of the Hermit's Peak/Calf Canyon Fire and sustained damages." 44 C.F.R. § 296.20.  First, a claimant first must file a Notice of Loss form that briefly describes each injury with the FEMA Claims Office.  See 44 C.F.R. § 296.5(b); § 296.10(a).  Second, a Claims Reviewer will review and evaluate the claim.  See 44 C.F.R. § 296.5(c).  Third, an Authorized Official[4] will determine whether compensation is due to the claimant.  See 44 C.F.R. § 296.5(d).  Furthermore, acceptance of an award under the Hermit's Peak Act bars recovery under the Federal Tort Claims Act or a civil action against the United States regarding the same subject matter.  See 44 C.F.R. § 296.5(a).

---

[4]The Hermit's Peak Regulations define Authorized Official as "an employee of the United States who is delegated with authority by the Director of the Claims Office to render binding determinations on claims and to determine compensation due to claimants under the Act."  44 C.F.R. § 296.4.

The Hermit's Peak Regulations contain an overview of the Hermit's Peak Act damages provisions, addressing allowable damages and then exclusions:

> (a)    Allowable damages.    The Act provides for the payment of actual compensatory damages for injury or loss of property, business loss, and financial loss.  The laws of the State of New Mexico will apply to the calculation of damages. Damages must be reasonable in amount.

> (b)    Exclusions.  Punitive damages, statutory damages under section 30-32-4 of the New Mexico Statutes Annotated (2019), interest on claims, attorney's fees and agents' fees incurred in prosecuting a claim under the Act or an insurance policy, and adjusting costs incurred by an insurer or other third party with the rights of a subrogee that may be owed by a claimant as a consequence of receiving an award are not recoverable from FEMA [. . . . ]

44 C.F.R. § 296.21(a)-(b).  In accordance with FEMA's commentary on the interim final rule, 88 Fed. Reg. at 59767, the allowable damages of "property, business loss, and financial loss" exclude noneconomic damages.  See 44 C.F.R. § 296.21(a).

Claimants may appeal the Authorized Official's determination by submitting a written request for review, i.e., an Administrative Appeal, that explains why the Authorized Official's determination was incorrect.  See 44 C.F.R. § 296.41(a).  A claimant dissatisfied with the outcome of an Administrative Appeal may seek judicial review of the decision by filing a civil lawsuit against FEMA in the United States District Court for the District of New Mexico.  See 44 C.F.R. § 296.43.

Initially, FEMA required that individuals submit a Notice of Loss by November 14, 2024. See 44 C.F.R. § 296.43.  Congress, however, passed a resolution that extends the deadline to December 20, 2024.  See Hermit's Peak/Calf Canyon Claims Office, FEMA.gov, https://www.fema.gov/hermits-peak (last updated December 6, 2024); Patrick Lohmann, Deadline for Hermits Peak-Calf Canyon Fire victims extended a month through federal spending bill, Source NM (September 25, 2024).

c.    **The Cerro Grande Fire Regulations**.

Like the Hermit's Peak Regulations, the Cerro Grande Fire Regulations state that the purpose of the Cerro Grande Fire Assistance Act is to "evaluate, process, and pay claims injuries and property damage resulting from the Cerro Grande Fire." 44 C.F.R § 295.1.    However, the Cerro Grande Fire Regulations' allowable damages differ significantly from the Hermit's Peak Regulations, despite the nearly identical language in the originating statutes.  Whereas the Hermit's Peak Regulations allow compensation of property, business, and financial loss, the Cerro Grande Fire Regulations allow compensation of losses recoverable in a tort action under NM State law:

> (a)    **Allowable compensation.**  The CGFAA provides for the payment of compensatory damages.  Compensatory damages are "real, substantial and just money damages established by the Claimant in compensation for actual or real injury or loss."  In general, an Injured Person will be compensated for Losses to the same extent that the plaintiff in a successful tort action brought against a private party under the laws of the State of New Mexico would be compensated.  In addition the CGFAA permits FEMA to compensate Injured Parties for certain categories of "loss of property," "business loss," and "financial loss," which are enumerated in the CGFAA.  Damages must be reasonable in amount.  Claimants must take reasonable steps to mitigate (reduce) their damages, if possible, as required by New Mexico tort law.

44 C.F.R. § 295.21.

d.    **The Plaintiffs**.

The Plaintiffs assert that the Hermit's Peak/Calf Canyon Fire destroyed their homes and forced them to relocate.  See Dolan Motion at 1.  The Court takes background information about the Plaintiffs from the Complaint for Declaratory Relief in Lands v. FEMA, No. CIV 23-0869 JB, filed October 3, 2023 (D.N.M.)(Doc. 1)("Lands Complaint")("Lands"), and from the Complaint for Declaratory & Injunctive Relief in Dolan v. FEMA, No. CIV 23-0908 JB, filed October 17, 2023 (D.N.M.)(Doc. 1)("Dolan Complaint")("Dolan").  The Plaintiffs in Dolan are Tobin Dolan, Lydia Dolan, Tangee Dolan, Dorothy Jones, Brian Rodgers, Barbara Rodgers, Michael Salazar,

Linda Salazar, Reynaldo Herrera, and Kathy Valera ("Dolan Plaintiffs").  See Dolan Complaint at 5.  Before the Hermit's Peak/Calf Canyon Fire, Tobin Dolan and L. Dolan resided in a single-family home on their fourteen-acre land in Rociada, New Mexico, that they jointly owned with Tobin Dolan's mother, Tangee Dolan, and Tobin's grandmother Dorothy Jones.  Dolan Complaint ¶ 9, at 5.  Tangee Dolan and Jones also resided in their own respective single-family homes on the fourteen-acre land.  See Dolan Complaint, ¶ 9, at 5.  The Dolans have owned the land for over twenty-five years.  See Dolan Complaint ¶ 9, at 5.  After the Hermit's Peak/Calf Canyon Fire, all of the Dolans -- Tobin Dolan, L. Dolan, Tangee Dolan, and Dorothy Jones -- now share an apartment "while they wait to rebuild."  Dolan Complaint ¶ 9, at 5.  Similarly, the Plaintiffs Brian Rodgers and Barbara Rodgers resided in a single-family home on a 241-acre property in Sapello, New Mexico, for twenty-five years, see Dolan Complaint ¶ 10, at 6.  M. Salazar and L. Salazar lived in a single-family home on 105-acres in Rociada, see Dolan Complaint ¶ 11, at 6-7; and Herrera and Valera lived in a single-family home near Rociada, see Dolan Complaint ¶ 12, at 7.  After the Hermit's Peak/Calf Canyon Fire, the Rodgers now live in a travel-trailer while they wait to rebuild their home.  Dolan Complaint ¶ 10, at 6.   All of the Dolan Plaintiffs allege that, as a result of the Hermit's Peak/Calf Canyon Fire and its destruction of their homes, they have "suffered and continue to suffer significant interference with personal comfort, annoyance, and inconvenience beyond the economic cost of their lost property."  Dolan Complaint ¶¶ 9-10, at 5-6.

The Plaintiffs in Lands are Marianna Lands and Charles Paynter.  See Lands Complaint ¶¶ 4-5, at 2.  Before the Hermit's Peak/Calf Canyon Fire, Lands resided in Cleveland, New Mexico.  See Lands Complaint ¶ 4, at 2.  Paynter lived on Trout Springs Ranch in Gallinas Canyon, Montezuma, New Mexico.  See Lands Complaint ¶ 5, at 2.  Both Lands and Paynter lived within

the Hermit's Peak/Calf Canyon Fire burn scar.[5]  See Lands Complaint ¶¶ 4-5, at 2.  The Hermit's

Peak/Calf Canyon Fire and the resulting flooding caused Lands and Paynter to relocate.  See Lands

Complaint ¶¶ 4-5, at 2.  Like the Dolan Plaintiffs, the Lands Plaintiffs allege that, as a result of the

Hermit's Peak/Calf Canyon Fire and its subsequent flooding, they suffered noneconomic damages

such as pain and suffering, annoyance, discomfort, and inconvenience.  See Lands Complaint ¶¶

4-5, at 2-3.

       The Court hereinafter refers to the Lands Plaintiffs and Dolan Plaintiffs as "the Plaintiffs,"

and the alleged losses which include pain and suffering, annoyance, discomfort, and inconvenience

as "noneconomic damages."

## PROCEDURAL BACKGROUND

       The Court first describes the Plaintiffs' initial Notice of Loss Claims submitted to FEMA

and FEMA's denial of compensation for noneconomic damages such as emotional distress.

Second, the Court briefly summaries the Plaintiffs' Motion and the United States' Response.

       1.    **The Plaintiffs Include Losses for Emotional Distress in Their Notice of Loss Claims.**

       The Plaintiffs filed Notice of Loss Claims with FEMA in 2023.  See Dolan United States

Administrative Record at 10366, lodged May 22, 2024 ("Dolan AR"); Federal Respondents'

Corrected Notice of Lodging of Administrative Record, filed May 1, 2024 (Dolan, Doc. 27); Lands

Stipulation of Parties to Supplement the Administrative Record and Notice of Lodging, lodged

June 26, 2024 ("Lands AR")(Doc. 39).  The Plaintiffs seek claims for various losses, including: (i)

---

[5]A wildfire burn scar is "a charred, barren, strip of land annihilated by the fire."  Sean
Breslin, Wildfire Burn Scars: How Long Until They Heal?  The Weather Channel,
https://weather.com/news/news/how-long-does-wildfires-burn-scar-need-heal-20130812 (Dec. 3,
2019)("Wildfire Burn Scars").  Because the burn scar is devoid of vegetation, rainfall can result in
a high risk of flash floods.  Wildfire Burn Scars.

real property such as repair, replacement, decreased value, and reforestation; (ii) personal property such as vehicles, equipment, and contents; (iii) lost wages and personal income; (iv) temporary living and relocation expenses; (v) emotional distress, nuisance, annoyance, discomfort and inconvenience; and (vi) attorney's fees.  See Tangee Dolan, Tobin A. Dolan, and Lydia A. Dolan Proof of Loss at 1-3, dated October 2, 2023, Dolan AR at 10366; Dorothy Jones Proof of Loss at 1-3, dated September 15, 2023, Dolan AR at 10383-92; Reynaldo Herrera and Kathy Varela Notice of Loss at 2, dated February 24, 2023, Dolan AR at 10393-98; Linda and Michael Salazar Proof of Loss at 1-3, dated November 20, 2023, Dolan AR at 10399-403; Barbara Rodgers Notice of Loss at 1-2, dated July 3, 2023, Dolan AR at 10404-13; Brian Rodgers & Mona Jeanne Rodgers-Johnson Notice of Loss at 1-2, dated July 20, 2023, Dolan AR at 10414-21; M. Lands Notice of Loss at 2, dated December 19, 2023, Lands AR; C. Paynter Notice of Loss at 2, dated July 16, 2023, Lands AR.  Additionally, as part of their Notice of Loss and Proof of Loss Claims, the Dolan Plaintiffs provide specific details about their emotional distress resulting from the Hermit's Peak Fire.  For example, the Dolans explain in their claim that their family has a "sentimental connection to the land," and that the "land they poured all their financial resources into and worked so hard to improve upon to leave a legacy for future generations is now gone."  Tobin Dolan & Lydia Dolan Amended Notice of Loss Attachment #1 Nuisance & Emotional Distress Damages at 1, Dolan AR at 10376.  Barbara Rodgers explains that her experience of the fire, loss of her home, loss of her property, and the evacuations resulted in "emotional set-backs from which she has yet to recover." Barbara Rodgers Notice of Loss Claim Supplemental Statement at 3, Dolan AR at 10413.  Brian Rodgers explains that the "sentimental value" of the losses of century old trees and forestry, as well as equipment for hosting an "annual Memorial Day Camp that had been ongoing since 1972,"

are difficult to quantify.  Brian Rodgers Notice of Loss Attachment #1 Emotional Distress &
Nuisance Damages at 1-2, <u>Dolan</u> AR 10420-21.

The AR also includes at least one instance where FEMA denies the Plaintiffs' claims for
emotional distress.  In its final determination letter for D. Jones' claims, FEMA explains that
"Emotional Distress" losses are "Not compensable under law."  Re: Final Letter of Determination
for Claim #8303 Dorothy Jones at 2, dated March 5, 2024, <u>Dolan</u> AR at 10378.

       a.       **<u>The Motion Briefing</u>**.

The Plaintiffs challenge that the FEMA's Hermit's Peak Regulations and the resulting
denial of their noneconomic damages, such as for emotional distress, are arbitrary and capricious
under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)("APA").  <u>See</u> <u>Dolan</u> Motion at 1.
They make two main arguments.  First, the Plaintiffs contend that they are entitled to noneconomic
damages, because the Hermit's Peak Act allows the Plaintiffs to recover for claims against FEMA
under New Mexico State law, and the Hermit's Peak/Calf Canyon Fire constitutes a nuisance or
trespass under New Mexico State law.  <u>See</u> <u>Dolan</u> Motion at 2.  Second, the Plaintiffs argue that
the text of the Hermit's Peak Act requires FEMA to provide "actual compensatory damages,"
which the Plaintiffs argue includes noneconomic damages.  <u>Dolan</u> Motion at 27-29; Hermit's Peak
Act § 104(c)(3)(A).

FEMA filed its Response Brief on the Merits of Petitioners' APA Challenge to Hermit's
Peak/Calf Canyon Fire Assistance Act Final Rule, <u>Dolan</u>, filed September 13, 2024 (Doc.
51)("<u>Dolan</u> Response"), and its Response Brief on the Merits of Petitioners' APA Challenge to
Hermit's Peak/Calf Canyon Fire Assistance Act Final Rule, <u>Lands</u>, filed September 13, 2024 (Doc.
50)("<u>Lands</u> Response")(collectively "FEMA Responses").  FEMA's main argument is that the
Hermit's Peak Act and the Hermit's Peak Regulations do not waive the United States' sovereign

immunity of claims for noneconomic damages in several ways.  See Dolan Response at 11.  First, FEMA argues that the NM State Law provision, § 104(c)(2), only waives sovereign immunity insofar as to apply New Mexico State law that governs the mathematical "calculation" of damages available in the Allowable Damages provision, § 104(d)(4).  See Dolan Response at 12.  Second, FEMA argues that the Allowable Damages provision, § 104(d)(4), includes only the following categories of allowable damages: loss of property, business loss, and financial loss, none of which includes noneconomic losses.  See Dolan Response at 12.  Third, FEMA argues that the Extent of Damages provision, § 104(c)(3), which limits recovery to "actual compensatory damages" for injuries, further limits recovery of damages for property, business, and financial losses.  Dolan Response at 12.  Fourth, FEMA argues that, because the Hermit's Peak Act does not authorize unequivocally noneconomic damages, it therefore does not waive sovereign immunity for noneconomic damages.  See Dolan Response at 13.

## LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION

The APA states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702.  The APA empowers reviewing courts, "[t]o the extent necessary to decision and

when presented," to "decide all relevant questions of law, interpret constitutional and statutory

provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C.

§ 706.  Such a reviewing court "shall":

>    (1)      compel agency action unlawfully withheld or unreasonably delayed;
> and
>
>    (2)      hold unlawful and set aside agency action, findings, and conclusions
> found to be --
>
>>    (A)      arbitrary, capricious, an abuse of discretion, or
>>    otherwise not in accordance with law;
>>
>>    (B)      contrary to constitutional right, power, privilege, or
>>    immunity;
>>
>>    (C)      in excess of statutory jurisdiction, authority, or
>>    limitations, or short of statutory right;
>>
>>    (D)      without observance of procedure required by law;
>>
>>    (E)      unsupported by substantial evidence in a case subject
>>    to sections 556 and 557 of this title or otherwise reviewed on the
>>    record of an agency hearing provided by statute; or
>>
>>    (F)      unwarranted by the facts to the extent that the facts
>>    are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.  This statutory provision provides the "default standard" of review under the APA,

which applies unless the agency's enabling act -- or another statute -- provides otherwise.  See

Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995)("[T]he APA provides a default

standard of judicial review -- arbitrary or capricious -- precisely for situations, such as this one,

where a statute does not otherwise provide a standard of judicial review.").  Technically, 5. U.S.C.

§ 706 provides standards -- not "a standard" -- of review, and different provisions in 5. U.S.C.

§ 706 are used according to the subject of the review: for example, the arbitrary-and-capricious

standard is used to review "[i]nformal agency action," and informal (notice and comment)

- 16 -

rulemaking, City of Colorado Springs v. Solis, 589 F.3d 1121, 1131 (10th Cir. 2009), and that standard is "'very deferential' to the agency's determination," Kobach v. U.S. Election Assistance Comm'n, 772 F.3d 1183, 1197 (10th Cir. 2014)(quoting W. Watersheds Project v. Bureau of Land Mgmt., 721 F.3d 1264, 1273 (10th Cir. 2013)).  Section 706's substantial evidence test, on the other hand, "applies almost exclusively to formal adjudication," Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 745 F.2d 677, 686 n.6 (D.C. Cir. 1984)(Scalia, J.)., because "a case subject to sections 556 and 557 of this title" refers to the APA's formal adjudication and formal rulemaking provisions, 5 U.S.C. § 706(2)(E).  De novo review, provided in 5 U.S.C. § 706(2)(F), the APA's least deferential standard of review, is limited to use in two instances: "(1) when the action is adjudicatory in nature and the agency's fact-finding procedures inadequate; and (2) when issues not previously before the agency are raised in a proceeding to enforce a nonadjudicatory action."  Franklin Sav. Ass'n v. Dir., Off. of Thrift Supervision, 934 F.2d 1127, 1142 n.7 (10th Cir. 1991)(emphasis in original)(citing Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)).[6]  Importantly, 5. U.S.C. § 706 also instructs the

---

[6]In 1947, shortly after the APA's passage, President Truman's Attorney General -- and future Associate Justice of the Supreme Court of the United States -- Tom Clark published the Attorney General's Manual on the Administrative Procedure Act, which was prepared as a guide to the then-nascent APA.  See United States Department of Justice, Tom C. Clark, Attorney General, Attorney General's Manual on the Administrative Procedure Act (1947)("AG's Manual on the APA").  Therein, Attorney General Clark remarks -- contrary to the Supreme Court's later interpretation of 5. U.S.C. § 706(2)(F) in Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. at 415 -- that "to the extent that the facts are subject to trial de novo by the reviewing court," 5. U.S.C. § 706(2)(F), "obviously refers only to those existing situations in which judicial review has consisted of a trial de novo."  AG's Manual on the APA at 109.  In essence, AG's Manual on the APA indicates that it was the Attorney General's view -- in 1947 -- that 5. U.S.C. § 706(2)(F) does not establish a standard by which courts could apply the de novo standard of review to situations outside of those which existed at the time of the APA's passage.  While this interpretation is not binding on any court, perhaps owing to its temporal proximity to the APA's passage, even the Supreme Court has acknowledged that "some deference" should be afforded to the AG's Manual

reviewing court, "[i]n making the foregoing determinations," to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. See Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1157 (10th Cir. 2004)(rejecting the notion that the reviewing court's analysis "should be limited to those passages expressly relied upon by the [agency]").

In the United States Court of Appeals for the Tenth Circuit, pursuant to Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994)("Olenhouse"), "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." Olenhouse, 42 F.3d at 1580 (emphasis in original).  See WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. at 1323.  "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant."  Northern New Mexicans Protecting Land and Water Rights v. United States, No. CIV 15-0559 JB/LF, 2015 WL 8329509, at *9 (D.N.M. Dec. 4, 2015)(Browning, J.).

1.    **Reviewing Agency Factual Determinations.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial

---

on the APA: "[T]he Attorney General's Manual on the Administrative Procedure Act 31, 35 (1947), a contemporaneous interpretation previously given some deference by this Court because of the role played by the Department of Justice in drafting the legislation, further confirms that view." Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 546 (1978)(footnote removed).

evidence," 5 U.S.C. § 706(2)(E).  The APA's two linguistic formulations amount to a single substantive standard of review.  See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 683-84 (explaining that, as to factual findings, "there is no substantive difference between what [the arbitrary-or-capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)).  See also Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness.  The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found within the record of closed-record proceedings to which it exclusively applies." (emphasis in original)).

Again, in reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record.  See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted.").  See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, [T]he Supreme Court [of the United States] has advised such review shall

be confined to the administrative record and, in most cases, no de novo proceedings may be had."). Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action.  See New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 702 n.21 (10th Cir. 2009)(citing rule 201(b) of the Federal Rules of Evidence)("We take judicial notice of this document, which is included in the record before us in [another case]."); New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.22 ("We conclude that the occurrence of Falcon releases is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned, and we take judicial notice thereof.").  In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits -- as well as decisions from the United States District Court for the District of Columbia -- have held that taking judicial notice is generally inappropriate in APA review, subject to extraordinary circumstances or inadvertent omission from the administrative record.  See Fence Creek Cattle Co. v. United States Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010); National Min. Ass'n v. Sec'y United States Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016); Dist. Hosp. Partners, L.P. v. Sebelius, 971 F. Supp. 2d 15, 32 (D.D.C. 2013)(Huvelle, J.)("The Court, however, notes that taking judicial notice is typically an inadequate mechanism for a court to consider extra-record evidence when reviewing an agency action."), aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46 (D.C. Cir. 2015).  Broadly, the Tenth Circuit has expressed that, "[w]hile judicial review of agency action is normally restricted to the administrative record, we have recognized that consideration of extra-record materials is appropriate in 'extremely limited' circumstances, such as where the agency ignored relevant factors it should have considered or considered factors left out of the formal record."  Lee v. U.S. Air Force, 354 F.3d 1229, 1242 (10th Cir. 2004)(quoting Am. Min. Cong. v. Thomas, 772 F.2d

617, 626 (10th Cir. 1985)).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the whole record before it when determining whether an agency's decision survives arbitrary-or-capricious review. Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 415). The Tenth Circuit explains:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colo. Env't Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999). Arbitrary-or-capricious review requires a district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions," Olenhouse, 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision, see Colo. Env't Coal. v. Dombeck, 185 F.3d at 1172. The agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings. See SEC v. Chenery Corp., 318 U.S. 80, 94 (1943)("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted by clearly disclosed and adequately sustained."). While the court may not supply a reasoned basis for the agency's action that the agency does not give itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

2.      **Reviewing Agency Legal Interpretations**.

In promulgating and enforcing regulations, agencies must interpret federal statutes, their

own regulations, and the Constitution, and courts reviewing those interpretations apply three

different deference standards, depending on the law at issue.  First, as it pertains to federal statutes,

between 1984 and 2024, courts had to defer to agency interpretations of ambiguous statutes that

the federal agency administered, and this deference was known as Chevron deference -- named

after the 1984 case of Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S.

837 (1984)("Chevron").  Chevron deference was a two-step process[7] that first asked whether the

statutory provision in question is clear and, if it is not clear, then asks whether the agency's

interpretation of the unclear statute is reasonable.  Chevron, 467 U.S. at 843.  The Supreme Court,

however, overturns this deferential approach during its October 2023 term in Loper Bright

Enterprises v. Raimondo, 144 S. Ct. 2244, 2273, 603 U.S. ___ (2024)("Loper Bright").

In Loper Bright, in an opinion that the Honorable John Roberts, Chief Justice of the United

States Supreme Court, authors, the Supreme Court reviews the traditional understandings of the

judicial function, quoting Alexander Hamilton for the proposition that "[t]he

Framers . . . envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar

province of the courts,'" Loper Bright, 144 S. Ct. at 2257 (quoting The Federalist no. 78

(Hamilton)), and the Honorable John Marshall, former Chief Justice of the United States, for the

oft-cited principle that "'[i]t is emphatically the province and duty of the judicial department to

say what the law is,'" Loper Bright, 144 S. Ct. at 2257 (quoting Marbury v. Madison, 1 Cranch

---

[7]There was, additionally, a threshold step -- which Professor Cass Sunstein famously called
"step zero" -- which asked whether Chevron deference applies to the agency decision at all.  See
Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187, 191 (2006).

137, 177 (1803)).  The Supreme Court describes that, although the New Deal "ushered in a 'rapid expansion of the administrative process,'" the Supreme Court continued to "adhere to the traditional understanding that questions of law were for courts to decide, exercising independent judgment."  Loper Bright, 144 S. Ct. at 2257 (quoting United States v. Morton Salt Co., 338 U.S. 632, 644 (1950)).  The Supreme Court then reads and analyzes the plain language of the APA's § 706 -- which states at the outset that, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706 -- and concludes that the APA "codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to Marbury: that courts decide legal questions by applying their own judgment."  Loper Bright, 144 S. Ct. at 2261.

The Supreme Court then explains that "[t]he deference that Chevron requires of courts reviewing agency action cannot be squared with the APA," Loper Bright, 144 S. Ct. at 2263, largely because "[t]he 'law of deference' . . . built on the foundation laid in Chevron [is] '[h]eedless of the original design' of the APA," Loper Bright, 144 S. Ct. at 2265 (quoting Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 109 (2015)(Scalia, J., concurring in the judgment)). Moreover, according to the Supreme Court, "agencies have no special competence in resolving statutory ambiguities.  Courts do."  Loper Bright, 144 S. Ct. at 2266.  In lieu of Chevron's presumption, the Supreme Court observes that "[t]he better presumption is . . . that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch."  Loper Bright, 144 S. Ct. at 2267.  This statement's rule, therefore, is what takes the place of Chevron deference: ordinary judicial interpretation of statutes, and courts are

free to review and reject statutory interpretations that federal agencies offer.[8]

Second, despite Chevron's demise, when agencies interpret their regulations -- to, for example, adjudicate whether a regulated party is in compliance with them -- courts accord agencies what is known as Auer or Seminole Rock deference. See Auer v. Robbins, 519 U.S. 452 (1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945). This deference is applied in the same manner as the erstwhile Chevron deference and is substantively identical. There would be little reason to have a separate name for this doctrine, except that its logical underpinnings are much shakier, and its future is, accordingly, uncertain. Justice Scalia, after years of applying the doctrine followed by years of questioning its soundness, finally denounced Auer deference in 2013 in his dissent in Decker v. Northwest Environmental Defense Center, 568 U.S. 597 (2013). The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice himself:

> For decades, and for no good reason, we have been giving agencies the

---

[8]The Supreme Court notes, however, that its holding does not forbid Congress from conferring some degree of statutory authority on agencies:

> That is not to say that Congress cannot or does not confer discretionary authority on agencies. Congress may do so, subject to constitutional limits, and it often has. But to stay out of discretionary policymaking left to the political branches, judges need only fulfill their obligations under the APA to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA. By forcing courts to instead pretend that ambiguities are necessarily delegations, Chevron does not prevent judges from making policy. It prevents them from judging.

Loper Bright, 144 S. Ct. at 2268. In addition, Loper Bright affirms that deference under Skidmore v. Swift & Co., 323 U.S. 134,139-40 (1944), continues to apply. See Loper Bright, 144 S. Ct. at 2262-63. Under this species of deference, "'interpretations and opinions' of the relevant agency, 'made in pursuance of official duty' and 'based upon . . . specialized experience,' 'constitute[d] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance,' even on legal questions." Loper Bright, 144 S. Ct. at 2259 (quoting Skidmore v. Swift & Co., 323 U.S. at 139-40)(ellipses in Loper Bright and brackets in Loper Bright).

- 24 -

authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations." Talk America, Inc. v. Michigan Bell Telephone Co., [564] U.S. [50, 67] . . . (2011) (Scalia, J., concurring).   This is generally called Seminole Rock or Auer deference.   See Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 65 S. Ct. 1215, 89 L. Ed. 1700 (1945); Auer v. Robbins, 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997).

. . . .

The canonical formulation of Auer deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  Seminole Rock, supra, at 414, 65 S. Ct. 1215, 89 L. Ed. 1700.  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for Auer to do.  In practice, Auer deference is Chevron deference applied to regulations rather than statutes.  See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

Our cases have not put forward a persuasive justification for Auer deference. The first case to apply it, Seminole Rock, offered no justification whatever -- just the ipse dixit that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." 325 U.S., at 414, 65 S. Ct. 1215, 89 L. Ed. 1700.  Our later cases provide two principal explanations, neither of which has much to be said for it.  See generally Stephenson & Pogoriler, Seminole Rock's Domain, 79 Geo. Wash. L. Rev. 1449, 1454-1458 (2011).  First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it.  E.g., Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 150-153, 111 S. Ct. 1171, 113 L. Ed. 2d 117 (1991).  The implied premise of this argument -- that what we are looking for is the agency's intent in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means." The Theory of Legal Interpretation, 12 Harv. L. Rev. 417, 419 (1899).  Whether governing rules are made by the national legislature or an administrative agency, we are bound by what they say, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" See, e.g., Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (1994).  That is true enough, and it leads to the conclusion that

agencies and not courts should make regulations.  But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective.  Making regulatory programs effective is the purpose of <u>rulemaking</u>, in which the agency uses its "special expertise" to formulate the best rule.  But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is."  <u>Marbury v. Madison</u>, 5 U.S. 137, 1 Cranch 137, 177, 2 L. Ed. 60 (1803).  Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience.  Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation <u>will be given effect</u> if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors.  If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for <u>Auer</u> deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that <u>Congress</u> enacted, as we do per <u>Chevron</u>, it is <u>a fortiori</u> reasonable to defer to them regarding the meaning of regulations <u>that they themselves crafted</u>.  To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all.  The theory of <u>Chevron</u> (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute.  <u>See</u> <u>Smiley v. Citibank (South Dakota), N.A.</u>, 517 U.S. 735, 740-741, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996).  While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations.  For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands.  "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."  Montesquieu, <u>Spirit of the Laws</u> bk. XI, at 151-152 (O. Piest ed., T. Nugent transl. 1949).  Congress cannot enlarge its own power through <u>Chevron</u> -- whatever it leaves vague in the statute will be worked out <u>by someone else</u>.  <u>Chevron</u> represents a presumption about who, as between the Executive and the Judiciary, that someone else will be.  (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.)  So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its <u>own</u> rules -- that is something else.  Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect.  "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power." <u>Thomas Jefferson Univ.</u>, <u>supra</u>, at 525, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (Thomas, J., dissenting).  Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it."  1 W. Blackstone, Commentaries on the Laws of England 58 (1765).  And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation.  The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke ed. 1961).  <u>Auer</u> deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures."  Anthony, <u>The Supreme Court and the APA: Sometimes They Just Don't Get It</u>, 10 Admin. L. J. Am. U. 1, 11-12 (1996).  <u>Auer</u> is not a logical corollary to <u>Chevron</u> but a dangerous permission slip for the arrogation of power.  <u>See</u> <u>Talk America</u>, 564 U.S., at 68-69, 131 S. Ct. 2254, 180 L. Ed. 2d 96 Scalia, J., concurring); Manning, <u>Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules</u>, 96 Colum. L. Rev. 612 (1996).

It is true enough that <u>Auer</u> deference has the same beneficial pragmatic effect as <u>Chevron</u> deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court.  The agency's view can be relied upon, unless it is, so to speak, beyond the pale.  But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute.  For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear.  The circumstances of this case demonstrate the point.  While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing.  <u>See</u> 77 Fed. Reg. 72974 (2012) (to be codified in 40 C.F.R. pt. 122, subpt. B).  It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here.  And there is another respect in which a lack of <u>Chevron</u>-type deference has less severe pragmatic consequences for rules than for statutes.  In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute.  That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

> In any case, however great may be the efficiency gains derived from <u>Auer</u> deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

<u>Decker v. Nw. Envtl. Def. Ctr.</u>, 568 U.S. 597, 616-21 (Scalia, J., dissenting).  Although the Court shares Justice Scalia's concerns about <u>Auer</u> deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.[9]

Moreover, courts afford agencies no deference in interpreting the Constitution.  <u>See</u> <u>U.S. West, Inc. v. FCC</u>, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to <u>Chevron</u> deference. . . .  [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, <u>e.g.</u>, <u>Rust v. Sullivan</u>, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and Constitutionally vested authority and responsibility to interpret -- the Constitution's content.  The presence of a Constitutional claim does not take a court's review outside of the APA, however -- 5. U.S.C. § 706(2)(B) specifically contemplates adjudication of Constitutional issues -- and courts still must respect agency fact-finding and the administrative record when reviewing agency action for Constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation.  <u>See</u>, <u>e.g.</u>, <u>Robbins v. U.S. Bureau of Land Mgmt.</u>, 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [Constitutional] due process claim against the [agency] under the framework set forth in the APA.").

---

[9]Clarence Thomas, Associate Justice of the Supreme Court, and Neil Gorsuch, Associate Justice of the Supreme Court, recently have echoed Justice Scalia's concerns with <u>Auer</u> deference, and have called on the Supreme Court to reconsider and overrule <u>Auer</u>.  <u>See</u> <u>Garco Construction, Inc. v. Speer</u>, 583 U.S. 1193, 1193-1195 (2018)(dissenting from denial of certiorari).

Last, the most recent development in <u>Chevron</u>-adjacent jurisprudence is the rise of the "major questions doctrine."[10]     <u>W. Virginia v. Env't Prot. Agency</u>, 597 U.S. 697, 724 (2022)(Roberts, C.J.)("<u>West Virginia v. EPA</u>").  Concisely put, under this doctrine, a court should not sustain an agency action that involves regulation of "major questions" -- those of great "'economic and political significance,'" <u>West Virginia v. EPA</u>, 597 U.S. at 721 (quoting <u>Food & Drug Administration v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 147 (2000)(O'Connor, J.)) -- unless the agency can point to clear Congressional authorization for such an action, <u>see</u> <u>West Virginia v. EPA</u>, 597 U.S. at 720-24.  Although the majority opinion in Supreme Court in <u>West Virginia v. EPA</u> never mentions the erstwhile <u>Chevron</u> doctrine, many academic commentators have conceptualized the major questions doctrine as a "exception" or

---

[10]The novelty -- or, alternatively, the historical basis -- of this doctrine is a source of debate, even among the Justices.  <u>Compare</u> <u>West. Virginia v. EPA</u>, 597 U.S. 697, 766 (2022)(Kagan, J., dissenting)(stating that the majority opinion "announces the arrival of the 'major questions doctrine'" (quoting Majority Op. at 724)), <u>with</u> <u>West Virginia v. EPA</u>, 597 U.S. at 740 (Gorsuch, J., concurring)(stating that "[s]ome version" of the major questions doctrine "can be traced to at least 1897").  <u>See</u> Thomas W. Merrill, <u>The Major Questions Doctrine: Right Diagnosis, Wrong Remedy</u> at 2, Hoover Inst., Legitimacy of Administrative Law Essay Series, available at https://www.hoover.org/sites/default/files/research/docs/ Merrill_WebReadyPDF.pdf (last visited November 16, 2024)(arguing that <u>West Virginia v. EPA</u> crystalized previous expressions of skepticism about "agency assertions of 'broad and unusual authority through an implicit delegation,'" into a distinct "doctrine" (quoting <u>Gonzalez v. Oregon</u>, 546 U.S. 243, 267 (2006)); Kevin O. Leske, <u>Major Questions About the "Major Questions" Doctrine</u>, 5 Mich. J. Env't & Admin. L. 479, 480 (2016)("After over a decade of hibernation, the United States Supreme Court has awoken the 'major questions' doctrine, which has re-emerged in an expanded form." (source of quoted material not cited)).  Nevertheless, the Court is comfortable saying that <u>West Virginia v. EPA</u> marks the "rise" of the major questions doctrine, because that case is the first time that the Supreme Court states that it is applying something called the "major questions doctrine."  <u>West Virginia v. EPA</u>, 597 U.S. at 724.  Justice Kavanaugh, when serving as a Judge on the United States Court of Appeals for the District of Columbia Circuit, once referred to something called the "major rules doctrine" -- which he defined by quoting Justice Scalia's observation that "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."  <u>United States Telecom Ass'n v. Fed. Commc'ns Comm'n</u>, 855 F.3d 381, 417 (D.C. Cir. 2017)( Kavanaugh, J., dissenting)(quoting <u>Util. Air Regul. Grp. v. E.P.A.</u>, 573 U.S. 302, 324 (2014)).

"carve-out" to Chevron analysis.  See Merrill, The Major Questions Doctrine: Right Diagnosis, Wrong Remedy at 2 ("[T]he major questions doctrine should be seen as a carve-out from the Chevron doctrine, one that all six justices in the conservative majority could agree on as a partial corrective to some of the most frequently cited failings of the Chevron regime."); William N. Eskridge, Jr. et. al., Textualism's Defining Moment, 123 Colum. L. Rev. 1611, 1675 (2023)("Recently, the Major Questions Doctrine (MQD) has become a prominent textualist-favored, policy-based exception to Chevron[.]"); Daniel T. Deacon & Leah M. Litman, The New Major Questions Doctrine, 109 Va. L. Rev. 1009, 1020-21 (2023)("In a set of cases, the [Supreme] Court has suggested either that an issue should not be analyzed using the Chevron framework because Congress did not authorize agencies to resolve the issue due to its majorness, or that the Chevron analysis operates differently because the agency policy is a major one."); Mila Sohoni, The Major Questions Quartet, 136 Harv. L. Rev. 262, 263-64 (2022)(arguing that West Virginia v. EPA and its companion cases "unhitched the major questions exception from Chevron, which has been silently ousted from its position as the starting point for evaluating whether an agency can exert regulatory authority.").  While many questions remain about the application of the major questions doctrine, at least for "major" questions, an agency will be presumed to have no authority to act unless Congress has "clearly" conferred on that agency the authority to act.  West Virginia v. EPA, 597 U.S. at 716.

### 3.    Waiving Sovereign Immunity.

The United States, as the sovereign, "cannot be sued without its consent."  Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.).  A court has no jurisdiction over a suit against the United States unless the United States consents to be sued.  See FDIC v. Meyer, 510 U.S. 471, 475 (1983)("Sovereign immunity is jurisdictional in nature."); United States v.

Mitchell, 463 U.S. 206, 212 (1983)(holding that it is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction"); Cortez v. E.E.O.C., 585 F. Supp. 2d 1273, 1282 (D.N.M. 2007)(Browning, J.)("If Congress has not waived sovereign immunity, the federal court does not have jurisdiction to hear the claim."). The United States' agencies have sovereign immunity absent a waiver. See FDIC v. Meyer, 510 U.S. at 475 ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); Cortez v. E.E.O.C., 585 F. Supp. 2d at 1283. Furthermore, "[w]hen the acts complained of by the plaintiff pertain to actions of defendants in their official capacity as agents of the United States, the claim is, in actuality, against the United States." Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1190 (D.N.M. 2010)(Browning, J.). See Kentucky v. Graham, 473 U.S. 159, 165-166 (1985)(recognizing that suits against officials in their official capacities "represent only another way of pleading an action against an entity of which an officer is an agent"). "The party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived." James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).

Congress often has waived the United States' sovereign immunity by statute. Such statutory waivers of the United States' sovereign immunity "must be unequivocally expressed in statutory text" and cannot be "implied." Lane v. Pena, 518 U.S. 187, 192 (1996). See Pueblo of Jemez v. United States, 430 F. Supp. 3d 943, 1149-50 (D.N.M. 2019)(Browning, J.), amended on reconsideration, 483 F. Supp. 3d 1024 (D.N.M. 2020), aff'd in part, vacated in part, rev'd in part, 63 F.4th 881 (10th Cir. 2023); Vigil v. FEMA, No. CIV 23-0941 JB/JFR, 2024 U.S. Dist. LEXIS 92879, *85 (D.N.M. May 23, 2024)(Browning, J.)(concluding that, because the Hermit's Peak Act § 104(i)(1) unequivocally expresses the claimant's right to sue FEMA in federal court, it constitutes a limited waiver of sovereign immunity); Oschwald v. Fed. Emergency Mgmt. Agency,

No. CIV 04-0667, 2005 WL 8164370, at *2 (D.N.M. January 26, 2005)(Torgerson, M.J.)(concluding that the judicial review provision of the Cerro Grande Fire Assistance Act, Pub. L. 106-246, 114 Stat. 511, does not include a waiver of sovereign immunity).  Accordingly, a "statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text."  Lane v. Pena, 518 U.S. at 192.  "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."  Lane v. Pena, 518 U.S. at 192.  For example, the FTCA waives sovereign immunity "for certain torts that United States employees cause while acting within the scope of their office or of their employment." De Baca v. United States, 403 F. Supp. 3d 1098, 1121 (D.N.M. 2019)(Browning, J.)(citing 28 U.S.C. §§ 2671-2680).  See Cortez v. E.E.O.C., 585 F. Supp. 2d at 1284 ("The only statutory authority to sue the United States for common-law torts is under the Federal Tort Claims Act . . . .").  Similarly, the Tucker Act, 28 U.S.C. § 1491, establishes a waiver of sovereign immunity for non-tortious claims seeking money damages "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491.

Perhaps the most important waiver of the United States' sovereign immunity is found in 5 U.S.C. § 702, which waives sovereign immunity for challenges to agency action with respect to non-monetary claims.  See 5 U.S.C. § 702.  The statute provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States . . . .

5 U.S.C. § 702 (ellipses added).  While claims for money damages seek monetary relief "to

substitute for a suffered loss," claims that do not seek monetary relief or that seek "specific remedies that have the effect of compelling monetary relief" are not claims for monetary damages. Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1298 (10th Cir. 2009)(emphasis in original). To determine whether a claim seeks monetary relief, a court must "look beyond the face of the complaint," and assess the plaintiff's prime object or essential purpose; "[a] plaintiff's prime objective or essential purpose is monetary unless the non-monetary relief sought has significant prospective effect or considerable value apart from the claim for monetary relief." Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting Burkins v. United States, 112 F.3d 444, 449 (10th Cir. 1997)). See, e.g., United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996)(explaining that, through 5 U.S.C. § 702, Congress provides "a general waiver of the government's sovereign immunity from injunctive relief."); Aero Tech, Inc., v. United States Department of the Interior, No. CIV 23-0726 JB/JHR, 2024 WL 4581545 at *12 n. 6 (D.N.M. October 25, 2024)(Browning, J.)(stating that the APA "waives sovereign immunity for all actions that seek 'relief other than money damages,' 5 U.S.C. § 702, which includes nonparty subpoenas" (citing Exxon Shipping Co. v. U.S. Dept. of the Interior, 34 F.3d 774, 778-79 n.9 (9th Cir. 1994)). Further, the waiver in 5 U.S.C. § 702 "is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005)("Simmat"); Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 58 F. Supp. 3d 1191, 1223 (D.N.M. 2014)(Browning, J.)(quoting Simmat, 413 F.3d at 1233). Because "the APA does not grant subject-matter jurisdiction," however, the APA cannot waive sovereign immunity "when the relevant statute 'precludes judicial review' or when 'agency action is committed to agency discretion by law.'" New Mexico v. McAleenan, 450 F. Supp. 3d at 1194-95 (quoting 5 U.S.C.

§ 701(a)(1)-(2)).

The APA's sovereign immunity waiver for claims "seeking relief other than money damages" does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act, 28 U.S.C. §§ 1346, 1491, permits district courts to hear some claims against the United States, but it also states that "district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). It follows that the APA does not waive the United States' sovereign immunity as to contract claims even when those claims seek relief other than money damages, such as declaratory or injunctive relief. See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1295. Consequently, two questions determine whether the APA waives the United States' sovereign immunity as to a particular claim: "First, does [the] claim seek 'relief other than money damages,' such that the APA's general waiver of sovereign immunity is even implicated? Second, does the Tucker Act expressly or impliedly forbid the relief that [the plaintiff] seeks, such that the APA's waiver does not apply?" Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING STATUTORY INTERPRETATION

When interpreting statutes, the Court must start with the plain language:

> We review issues of statutory construction de novo, "interpret[ing] the words of the statute in light of the purposes Congress sought to serve." In so doing, we begin with the "language employed by Congress," and we "read the words of the statute in their context and with a view to their place in the overall statutory scheme."

Been v. O.K. Indus., Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)(quoting Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233-34 (10th Cir. 2006)). See United States v. Wright, 48

F.3d 254, 255 (7th Cir. 1995).  "It is well established that 'when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'"  Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004)(quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)).  See In re Trans Ala. Pipeline Rate Cases, 436 U.S. 631, 643 (1978)(noting that a court may not disregard the statute's plain language unless a literal application of the statutory language "would lead to absurd results . . . or would thwart the obvious purpose of the statute")(quoting Commissioner v. Brown, 380 U.S. 563, 571 (1965)).  "Courts indulge 'a strong presumption that Congress expresses its intent through the language it chooses.  Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it.'"  United Kingdom Ministry of Defence v. Trimble Navigation Ltd., 422 F.3d 165, 171 (4th Cir. 2005)(quoting Sigmon Coal Co. v. Apfel, 226 F.3d 291, 305 (4th Cir. 2000)).  See Pub. Lands Council v. Babbitt, 167 F.3d 1287, 1314 (10th Cir. 1999)("[W]e assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress's legislative purpose.").  See also Hamdan v. Chertoff, 626 F. Supp. 2d 1119, 1126 (D.N.M. 2007)(Browning, J.).

The Supreme Court has "frequently cautioned that 'it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law.'"  United States v. Wells, 519 U.S. 482, 496 (1997)(quoting Nat'l Lab. Rels. Bd. v. Plasterers' Local Union No. 79, 404 U.S. 116, 129-130 (1971)).  An omission of a substantive or procedural aspect in a statute does not invite "a judicial guess as to what Congress would have wanted."  Sec. Exch. Comm'n v. Traffic Monsoon, LLC, 245 F. Supp. 3d 1275, 1290 (D. Utah 2017)(Parrish, J.).    In the face of

Congressional silence, the judiciary must be cautious to avoid "insert[ing] convenient language to yield the court's preferred meaning." Borden v. United States, 141 S. Ct. 1817, 1829 (2021).

When Congress does not provide a cause of action, the Court is not authorized[11] "to create causes of action -- decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition." Corr. Servs. Corp. v. Malesko, 542 U.S. 61, 75 (2001)(Scalia, J., concurring). "At bottom, creating a cause of action is a legislative endeavor. Courts engaged in that unenviable task must evaluate a 'range of policy considerations,'" which Congress is better equipped to consider. Egbert v. Boule, 142 S. Ct. 1793, 1802-03 (2022)(quoting Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 407 (1971)). Generally, "'even a single sound reason to defer to Congress' is enough to require a court to refrain" from implying a cause of action where none has been provided. Egbert v. Boule, 142 S. Ct. at 1803 (quoting Nestlé USA, Inc. v. Doe, 593 U.S. 628, 635 (2021)).

## LAW REGARDING FEDERAL DISTRICT COURT INTERPRETATIONS OF STATE LAW

Federal district courts must apply State law under certain circumstances, such as when a statute requires, or when exercising diversity jurisdiction. Under Erie Railroad Co. v. Tompkins,

---

[11]In Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court creates a cause of action under the Fourth Amendment to the Constitution of the United States against federal agents who allegedly "manacled the plaintiff in front of his wife and children, and threatened to arrest the entire family." 402 U.S. at 389. While the Supreme Court recognizes that "the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages" a remedy was deemed appropriate under general principles of federal jurisdiction. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. at 396. Since that decision the Supreme Court has not "implied additional causes of action under the Constitution. Now long past 'the heady days in which this Court assumed common-law powers to create causes of action' we have come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'" Egbert v. Boule, 142 S. Ct. at 1802 (quoting Corr. Servs. Corp. v. Malesko, 534 U.S. at 75 (Scalia, J., concurring); Hernandez v. Mesa, 140 S. Ct. 735, 741 (2020)).

304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). If a district court looks to New Mexico State law when exercising diversity jurisdiction, for example, but cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law," the district court "must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). See Siloam Springs Hotel, L.L.C. v. Century Sur. Co., 906 F.3d 926, 932 (10th Cir. 2018)(holding that, because the majority of the Oklahoma Supreme Court declines to reach the merits of the issue, "we must predict how that court would likely rule on this issue if the issue were properly before it"); Peña v. Greffet, 10 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.)("Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court.").[12] If the Court finds only an

---

[12]In performing its Erie-mandated duty to predict what a State supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1987), a federal court may sometimes contradict the State supreme court's own precedent if the federal court concludes that the State supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should be reticent to formulate an Erie prediction that conflicts with State court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in State and federal courts, as the old State supreme court precedent usually binds State trial and appellate courts. The factors to which a federal court should look before making an Erie prediction that a State supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the State supreme court decision from which the federal court is considering departing -- the younger the State case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the State supreme court -- have placed on the State decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the State decision articulates, especially if the State supreme court explicitly has called an older case's holding into question; (iv) changes in the composition of the State supreme court, especially if

- 37 -

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[13]    The Court also may rely on

---

mostly dissenting justices from the earlier State decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a State supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent State-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[13]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the State's highest court:

The highest state court is the final authority on state law (Beals v. Hale, 4 How. 37, 54; Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78), but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State. See Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 209. An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question. We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

Tenth Circuit decisions interpreting New Mexico law.[14]   See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.  Ultimately, "the Court's task is to predict what

---

> . . . .
>
> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, (Erie Railroad Co. v. Hilt, 247 U.S. 97, 100, 101; Erie Railroad Co. v. Duplak, 286 U.S. 440, 444), and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
>        The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940).  The Supreme Court has softened this position over the years; federal courts are no longer bound by State trial or intermediate court opinions, but "'lower state courts' should be 'attributed some weight . . . the decision [is] not controlling . . .' where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (quoting King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A Moore's Federal Practice - Civil § 124.20 (Matthew Bender 3d Ed.)("Moore's")("federal courts should follow decisions of intermediate state appellate courts unless persuasive data indicate that the highest state court would decide the issue differently").

        [14]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and State court interpretations of State law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a State's law in the ensuing years, then parties litigating State law claims will be subject to a different body of substantive law, depending on whether they litigate in State court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply State court interpretations of State law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court in the direction of according Tenth Circuit precedent less weight, and according State court decisions issued in the ensuing years more weight.  On the other hand, when the State law is unclear, it is desirable for there to at least be uniformity among federal judges as

to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a State's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects State law -- at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent State court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the State's highest court, on one end; and independently interpreting the State law, regarding the Tenth Circuit precedent as persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the State courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the State law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the State's common law in making his or her determination -- the same as a State judge would. Systemic inconsistency between the federal courts and State courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting State law, and the State courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the State forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in State law. Tenth Circuit decisions interpreting a particular State's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the State's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in State law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular State's law is wasted. Other than Oklahoma, every State encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the State law of the State in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one State. It is perhaps a more workable design for each district court to keep track of legal developments in the State law of its own State(s) than it is for the Tenth Circuit to monitor separate legal developments in eight States.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of State law is as follows: the Tenth

Circuit's cases are binding as to their precise holding -- what the State law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a State law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on State court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening State court cases.

When interpreting State law, the Tenth Circuit does not and cannot issue a case holding that <u>x</u> is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is <u>x</u>.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on State law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting State law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of State law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of State law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

<u>Erie</u>'s purpose is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or State forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the States' highest court would rule if confronted with the issue."  <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 (stating that intermediate appellate courts are "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise")).  This may not be the most precise formulation if the goal is to ensure identical outcomes in State and federal court -- the Honorable Milton I. Shadur, United States District Judge for the United States District Court of the Northern District of Illinois, looks to State procedural rules to determine in which State appellate circuit the suit would have been filed were it not in federal court, and then applies the State law as that circuit court interprets it, see <u>Abbott Laboratories v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the State supreme court's holdings often will lead to litigants obtaining a different result in federal court than they would in State court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative State supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated

obligation to consider State appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by State supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of State law.

The Erie doctrine results in federal cases that interpret State law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (States must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting State law often become stale.  New State court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of State law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., the Tenth Circuit says:

> Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of stare decisis.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear the Tenth Circuit permits a district court to deviate from the Tenth Circuit's view of State law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest State court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

the state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. See also Estate

of Anderson v. Denny's, Inc., No. CIV 12–0605 JB/GBW, 2013 WL 6506319, *32 & n. 16

(D.N.M. Nov. 13, 2013)(Browning, J.)(noting that the Court's task is to predict what the Supreme

Court of New Mexico would do); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1214 (D.N.M.

2008)(Browning, J.)("The Court's task is to divine, as much as possible, what the Supreme Court

of New Mexico would do if the legal question was presented to it.").

---

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [*v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867. Whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)(holding that the Colorado Court of Appeals case Biosera Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998) is not an "intervening decision of the state's highest court")(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)(emphasis in Kokins v. Teleflex, but not in Wankier v. Crown Equip. Corp.).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to administer independently the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting State law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie. This scheme may be inefficient, because the plaintiffs may appeal, after trial, the Court's ruling on an issue; the Tenth Circuit may certify the question to the Supreme Court of New Mexico, and the Tenth Circuit may then have to reverse the Court after a full trial on the merits.

## LAW REGARDING THE FTCA

In 1948, Congress enacted the FTCA, which waives the United States' sovereign immunity for some tort actions against the United States seeking money damages.  See 28 U.S.C. § 1346(b); Fed. Deposit Ins. v. Meyer, 510 U.S. 471, 475 (1994); Warren v. United States, 244 F. Supp. 3d 1173, 1212 (D.N.M. 2017)(Browning, J.).  In enacting the FTCA, Congress waives the United States' sovereign immunity as to

> claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).  "The FTCA's waiver of sovereign immunity is limited, however."  Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d at 304-05).  Moreover, the only proper party in an action under the FTCA is the United States.  See 28 U.S.C. § 2679(a); Smith v. United States, 561 F.3d 1090, 1099 (10th Cir. 2009)(quoting Oxendine v. Kaplan, 241 F.3d 1272, 1275 n.4 (10th Cir. 2001))("'The United States is the only proper defendant in an FTCA action."); De Baca v. United States, 399 F. Supp. 3d 1052, 1183-84 (D.N.M. 2019)(Browning, J.)(concluding that Isleta Pueblo is not a federal employee for FTCA purposes because the facts show that Isleta Pueblo entered an independent contractor agreement with the Forest Service).

Even when the FTCA waives the United States' sovereign immunity, the United States is liable for FTCA claims, if at all, only "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  "The Tort Claims Act was designed

primarily to remove the sovereign immunity of the United States from suits in tort and, with certain

specific exceptions, to render the Government liable in tort as a private individual would be under

like circumstances." Richards v. United States, 369 U.S. 1, 6 (1962). The FTCA leaves untouched

the States' laws that might apply to the United States once Congress removes that immunity. The

Supreme Court notes:

> Rather, [the FTCA] was designed to build upon the legal relationships
> formulated and characterized by the States, and, to that extent, the statutory scheme
> is exemplary of the generally interstitial character of federal law. If Congress had
> meant to alter or supplant the legal relationships developed by the States, it could
> specifically have done so to further the limited objectives of the Tort Claims Act.

Richards v. United States, 369 U.S. at 6-7. Accordingly, "the United States is placed in the same

position as a private individual by rendering the United States liable for the tortious conduct of its

employees if such conduct is actionable in the State in which the United States' action or inaction

occurred." Cortez v. EEOC, 585 F. Supp. 2d at 1284. Cf. Garcia v. United States, No. CIV 08-

0295 JB/WDS, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)("The law of the

place where the alleged negligent conduct took place determines the scope of employment under

the FTCA." (citing 28 U.S.C. § 1346(b)). See Richards v. United States, 369 U.S. at 9; Williams

v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th

Cir. 1970).

The United States' liability is coextensive with that of private individuals under the

respective States' law, even if comparable government actors or public entities would have

additional defenses or additional obligations under that State's law. See United States v. Olson,

546 U.S. 43, 44-47 (2005); In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs),

668 F.3d 281, 288 (5th Cir. 2012)(citing LaBarge v. Cty. of Mariposa, 798 F.2d 364, 366-69 (9th

Cir. 1986)("Because the federal government could never be exactly like a private actor, a court's

job in applying the standard is to find the most reasonable analogy.  Inherent differences between the government and a private person cannot be allowed to disrupt this analysis."); United States v. Olson, 546 U.S. at 47)); DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007)("Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties."); Ewell v. United States, 776 F.2d at 248-49; Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)( "This and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute."); Proud v. United States, 723 F.2d 705, 706 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States.  And the FTCA specifically provides that the federal government's tort liability is co-extensive with that of a private individual under state law.").  The Tenth Circuit in Ewell v. United States explains the reasoning behind the FTCA's waiver of sovereign immunity:

> The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed.  There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit.  The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA.  The Court was concerned with state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity."  374 U.S. at 164 . . . .  The immunity under consideration in that case applied to state, county and municipal prison officials.  Noting its decision in Indian Towing Co. v. United States, 350 U.S. [61]at 65 [(1955)] . . . wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.
>
> Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the

federal government because it is liable only as a private individual under like circumstances.

Ewell v. United States, 776 F.2d at 249.

The FTCA contains several exceptions to its waiver of immunity.  See 28 U.S.C. § 2680.  One such exception is the discretionary-function exception, which provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on that part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  In De Baca v. United States, 399 F. Supp. 3d 1052, the Court holds that the FTCA's discretionary-function exception applies to the Forest Service's various actions that result in the June 15, 2015, Dog Head Fire in Cibola National Forest, New Mexico.  See De Baca v. United States, 399 F. Supp. 3d at 1071, 1211.  The Court holds that the Forest Service's "fire prevention and management decisions rest in policy concerns."  See De Baca v. United States, 399 F. Supp. 3d at 1212.  The Forest Service, therefore, acts within its discretion in deciding where to position fire engines, has no mandatory duty to implement site-specific fire restrictions, has no policy about site-specific assessments before the Dog Head Fire, and does not have a mandatory duty to protect against destruction by fire.  See De Baca v. United States, 399 F. Supp. 3d at 1211-13.  Additionally, the Court holds that the Forest Service's decision to contract with Isleta Pueblo, and to delegate responsibility to "thin the project site and to adhere to the maximum slash[15] depth are within the [U.S.] Forest Service's

---

[15]The Court defines "slash" earlier in De Baca v. United States' factual background section:

> "In forestry, slash, or slashings are coarse and fine woody debris generated during logging operations or through wind, snow or other natural forest disturbances. Slash generated during logging operations may increase fire hazard, and some North American states have passed laws requiring the treatment of logging slash." Slash (logging), Wikipedia, https://en.wikipedia.org/wiki/Slash_(logging) (last visited May 17, 2019).

discretion," 399 F. Supp. 3d at 1213, and that the decision to hire an independent contractor is a

discretionary function.  See De Baca v. United States, 399 F. Supp. 3d at 1213 (citing Coffey v.

United States, 906 F. Supp. 2d at 1158).

The Tenth Circuit emphasizes that all dismissals for lack of jurisdiction, including those

for a failure to establish a waiver of sovereign immunity under the FTCA, should be without

prejudice.  See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010).[16]  It has explained:

"'A longstanding line of cases from this circuit holds that where the district court dismisses an

action for lack of jurisdiction . . . the dismissal must be without prejudice.'"  Mecca v. United

States, 389 F. App'x at 780 (quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th

Cir. 2006)).  The Tenth Circuit holds in Mecca v. United States that the district court improperly

dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked jurisdiction

over those claims.  See 389 F. App'x at 780-81 ("Here, because the district court found itself

without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice,

---

De Baca v. United States, 399 F. Supp. 3d at 1073 n.20.

[16]Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010) is an unpublished
opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is
persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not
precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

In this circuit, unpublished orders are not binding precedent, . . . And we
have generally determined that citation to unpublished opinions is not favored.
However, if an unpublished opinion or order and judgment has persuasive value
with respect to a material issue in a case and would assist the court in its disposition,
we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Mecca
v. United States and Pahoua Xiong v. Knight Transp.. Inc., 658 Fed. Appx. 884 (10th Cir. 2016)
have persuasive value with respect to a material issue, and will assist the Court in its disposition
of this Memorandum Opinion and Order.

even if the court deemed further amendment futile. We therefore remand with instructions to enter dismissal of these claims without prejudice.").

<u>ANALYSIS</u>

The Court concludes that the Hermit's Peak Act waives FEMA's sovereign immunity for the Plaintiffs' claims seeking noneconomic damages in three ways. First, the NM State law provision § 104(c)(2), allows the Plaintiffs to recover damages that are available under New Mexico State law, which includes noneconomic damages for nuisance, and which the Court predicts also includes noneconomic damages for trespass. Second, the Extent of Damages provision § 104(c)(3)'s use of "actual compensatory damages" includes noneconomic damages, because the only explicit exclusions are punitive damages and pre-judgment interest. Third, the Allowable Damages provision § 104(d)(4)'s list of property, business, and financial loss is not exhaustive of the types of allowable damages; these categories, therefore, are recoverable in addition to "actual compensatory damages" such as noneconomic damages. The Court concludes, therefore, that FEMA's Hermit's Peak Regulation that precludes recovery of noneconomic damages is arbitrary and capricious in violation of the APA, 5. U.S.C. § 706(2)(A), and compels FEMA to award noneconomic damages under the Hermit's Peak Act under the APA, 5. U.S.C. § 706(1).

## I. THE COURT CONDUCTS AN APA REVIEW OF THE HERMIT'S PEAK <u>REGULATION DE NOVO</u>.

Because the Plaintiffs challenge FEMA's Hermit's Peak Regulations under the APA, the Court reviews the Hermit's Peak Regulations under the APA's judicial review provision, 5. U.S.C. § 706. Section 706 provides that, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C.

§ 706.  In Loper Bright, the Supreme Court cites 5. U.S.C. § 706 to conclude that "courts decide legal questions by applying their own judgment."   Loper Bright, 144 S. Ct. at 2261.   When reviewing questions of law under the APA, courts review the agency's decision de novo.  See Sunnyside Coal Company v. Director, Office of Workers' Compensation Programs, United States, 112 F.4th 902, 910 (10th Cir. 2024)(citing Antelope Coal Company/Rio Tinto Energy America v. Goodin, 743 F.3d 1331, 1341 (10th Cir. 2014)).   The Court gives no deference to the agency's interpretation of the statute.   See Sunnyside Coal Company v. Director, Office of Workers' Compensation Programs, United States, 112 F.4th at 910 (citing Loper Bright, 144 S. Ct. at 2261). Here, therefore, the Court reviews de novo the Hermit's Peak Regulation that precludes recovery of noneconomic damages for injuries resulting from the Hermit's Peak Act.

## II.    THE HERMIT'S PEAK ACT WAIVES FEMA'S SOVEREIGN IMMUNITY FOR DAMAGES UNDER NEW MEXICO STATE LAW.

The Court concludes that the NM State law provision, § 104(c)(2), waives FEMA's sovereign immunity, see Sunnyside Coal Company v. Director, Office of Workers' Compensation Programs, United States, 112 F.4th at 910, because it states that the Plaintiffs can recover damages that are available under New Mexico State law.  Specifically under New Mexico State law, the Hermit's Peak/Calf Canyon Fire constitutes nuisance and trespass torts, and under New Mexico State law, noneconomic damages for discomfort, annoyance, and inconvenience are recoverable for nuisance and trespass.   Also under New Mexico State law, noneconomic damages for discomfort, annoyance, and inconvenience are recoverable for personal injury torts.  The Court, therefore, concludes that the Plaintiffs can recover noneconomic damages for nuisance, trespass, and personal injury tort claims resulting from the Hermit's Peak/Calf Canyon Fire.

### A.    THE NM STATE LAW PROVISION, § 104(C)(2), WAIVES SOVEREIGN IMMUNITY.

FEMA argues that New Mexico State law applies only to the "calculation" of the property, business, and financial losses within the Allowable Damages provision, as opposed to the broader determination of which damages apply.  Hermit's Peak Act § 104(c)(2).  See Dolan Response at 19-20.  The NM State law provision, § 104(c)(2), states that "the laws of the State of New Mexico shall apply to the calculation of damages" under the Allowable Damages provision, § 104(4). Hermit's Peak Act § 104(c)(2).

FEMA argues that only New Mexico State law which pertains to the mathematical "calculation" of damages in the Allowable Damages provision, § 104(d)(4), applies.  Dolan Response at 12, 19.  But FEMA merely implies this overly narrow definition of "calculation," and overlooks other legitimate yet broader definitions of "calculation," as well as relevant New Mexico State law that more broadly concerns the determination of damages.  See Hearing Tr. 82:19-85:2 (Sydow).  First, Merriam-Webster defines "calculation" as: (i) the process or an act of calculating; and    (ii)    studied    care    in    analyzing    or    planning. Calculation,  Merriam-Webster,  https://www.merriam-webster.com/dictionary/calculation  (last updated November 30, 2024).  Merriam-Webster also defines "calculating" as: (i) to determine by a mathematical process; (ii) to reckon by exercise of practical judgment; (iii) to solve or probe the meaning of; (iv) to design or adapt for a purposes.    Calculate,  Merriam-Webster, https://www.merriam-webster.com/dictionary/calculate (last accessed November 1, 2024).  The Court does not interpret "calculation" to exclusively mean a mathematical calculation, at the expense of other practical definitions such as a judgment, determination, analysis, plan, or design. Further, FEMA's interpretation of  "calculation" as a mathematical calculation contrasts with existing NM State law on calculating damages.  At the hearing, FEMA provided an example of

how NM State law, namely the New Mexico Civil Uniform Jury Instructions ("NM Civil Jury Instructions"), includes several different methods for a jury to calculate personal property damages. See Hearing Tr. 82:19-85:2 (Sydow). "In determining property damages," the NM Civil Jury Instructions state that the jury may award the fair market value of the property immediately before the loss, see New Mexico Rules Annotated ("NMRA") 13-1812, compare the value before and after the loss, see NMRA 13-1814, award the depreciation value, see NMRA 13-1815, award the repair plus depreciation value, see NMRA 13-1817, among other ways, see NMRA 13-1812 to 1819.[17] The Court agrees that the NM Civil Jury Instructions on determining property damages are an example of a NM State law that applies to the "calculation" of damages under the NM State law provision, § 104(c)(2).[18] What FEMA misses, however, is that the NM Civil Jury Instructions

---

[17]While the New Mexico Statutes Annotated is the official compilation of New Mexico statutory law, the New Mexico Rules Annotated or "NMRA" contains the rules, forms, and jury instructions of the New Mexico courts. See Probate definitions, N.M. Prob. Ct. R. 1B-102.

[18]Although New Mexico's Uniform Jury Instructions can be challenged as incorrect statements of law, "'[t]he Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law.'" Grasshopper Natural Medicine, LLC v. Hartford Casualty Ins. Co., No. CIV 15-0338 JB/CEG, 2016 WL 4009834, at *31 n.18 (D.N.M. July 7, 2016)(Browning, J.)(quoting Back v. ConocoPhillips Co., No. CIV 12-0261 JB/WDS, 2012 WL 6846397, at *15 n.2 (D.N.M. August 31, 2012)(Browning, J.)(citing State v. Wilson, 1994-NMSC-009, ¶ 5, 116 N.M. 793, 867 P.2d 1175, 1178)). With respect to Uniform Jury Instructions committee commentary, the Supreme Court of New Mexico has explained:

> In any event, the committee comment is not the law of New Mexico, see O'Hare v. Valley Utils., Inc., 89 N.M. 105, 112, 547 P.2d 1147, 1154 . . . (stating that committee comments are not equivalent to the directions for use), rev'd on other grounds, 89 N.M. 262, 550 P.2d 274 (1976), and comments must stand on their own merit without implied endorsement of this Court.

Cress v. Scott, 1994-NMSC-008, ¶ 6, 117 N.M. 3, 868 P.2d 648, 650-51.

includes jury instructions on deciding personal injury damages, which include instructions on deciding damages for pain and suffering, and loss of enjoyment of life:

> 13-1807.  Pain and suffering.
>
> The pain and suffering experienced [and reasonably certain to be experienced in the future] as a result of the injury.
>
> No fixed standard exists for deciding the amount of these damages. You must use your judgment to decide a reasonable amount to compensate the plaintiff for the pain and suffering.
>
> 13-1807A. Loss of enjoyment of life.
>
> The loss of enjoyment of life experienced [and reasonable certain to be experienced in the future] as a result of the injury.
>
> No fixed standard exists for deciding the amount of these damages. You must use your judgment to decide a reasonable amount to compensate the plaintiff for the loss of enjoyment of life.

NMRA 13-1807, 13-1807A [brackets in original].  Like the NM Civil Jury Instructions on determining personal property damages, the instructions on deciding such noneconomic damages for pain and suffering and loss of enjoyment of life reflect the "laws of the State of New Mexico" that "shall apply to the calculation of damages under [the Allowable Damages provision]." Hermit's Peak Act § 104(c)(2).  The NM Civil Jury Instructions, moreover, show that New Mexico State law has no "fixed standard" or mathematical calculation for determining noneconomic damages, because such a calculation is legal instead of factual.  See NMRA 13-1807, 13-1807A. A juror must calculate noneconomic damages based on what is reasonable.  See NMRA 13-1807, 13-1807A.  The Court concludes that the Hermit's Peak Act allows recovery of noneconomic damages, because the NM Civil Jury Instructions on deciding personal injury damages, such as for pain and suffering and for loss of enjoyment and life, apply to the calculation of allowable damages under the NM State law provision, § 104(c)(2).  The NM State law provision, § 104(c)(2), thus

waives FEMA's sovereign immunity.  Even if using FEMA's definition of "calculation" were to mean mathematical calculation -- which it does not, the NM Civil Jury Instructions on determining damages such as noneconomic damages for pain and suffering function as applicable New Mexico State law.

Notably, FEMA's Cerro-Grande Fire Regulations from 2001 interpret an identical statute, the Cerro-Grande Fire Act, as waiving sovereign immunity for claims pursuing noneconomic damages.  FEMA's Cerro-Grande Fire Assistance Act Regulations state that the recoverable compensatory damages under the Cerro-Grande Fire Assistance Act include losses "to the same extent that the plaintiff in a successful tort action brought against a private party under the laws of the State of New Mexico would be compensated."  44 C.F.R. § 295.21(a).  The Cerro-Grande Fire Act Regulations also note that the property, business, and financial losses in the Cerro-Grande Fire Act's Allowable Damages provision are "in addition" to damages recoverable under New Mexico State law.  44 C.F.R. § 295.21(a).  Here, FEMA interprets the language of the Hermit's Peak Act, which is identical to the language in the Cerro-Grande Fire Act, curiously to reach the opposite conclusion.  FEMA does not, however, provide any explanation as to why its interpretation of allowable damages in the Hermit's Peak Act is so different from that of the Cerro-Grande Fire Act.  The Court concludes that FEMA's interpretation of the language in the Hermit's Peak Act is not only wrong, but also inconsistent with its prior comparable regulations.  FEMA's action in promulgating the Hermit's Peak Regulations to preclude recovery of noneconomic damages is arbitrary and capricious, and therefore violates the arbitrary-or-capricious provision of the APA, 5. U.S.C. § 706(2)(A).

**B.    THE PLAINTIFFS CAN RECOVER NONECONOMIC DAMAGES FOR PRIVATE NUISANCE BECAUSE THE HERMIT'S PEAK/CALF CANYON FIRE IS AN INVASION OF THE USE AND ENJOYMENT OF PROPERTY.**

The Plaintiffs assert that under New Mexico State law, private nuisance allows for the recovery of noneconomic damages such as annoyance, discomfort, and inconvenience. See Dolan Motion at 17. The Plaintiffs argue that because the Hermit's Peak/Calf Canyon Fire is a private nuisance under New Mexico State law, they can recover for noneconomic damages. See Dolan Motion at 17. First, the Court concludes that the Hermit's Peak/Calf Canyon Fire constitutes a nuisance under New Mexico State law, because it is an invasion into the Plaintiffs' property that is unintentional, reckless, and abnormally dangerous activity. Second, the Court notes that property owners in New Mexico who pursue a private nuisance action can recover noneconomic damages for discomfort and annoyance. The Court, therefore, concludes that the Plaintiffs here can recover noneconomic damages resulting from the Hermit's Peak/Calf Canyon Fire under a New Mexico State law nuisance claim.

### 1.   The Hermit's Peak/Calf Canyon Fire Is a Nuisance under New Mexico State Law.

Private nuisance is a "civil wrong based on a disturbance of rights in land." Jellison v. Gleason, 1967-NMSC-033, ¶ 6, 77 N.M. 445, 448, 423 P.2d 876, 877 (citing Prosser, Torts, 3d ed. 1964, § 87, at 594). The Restatement defines private nuisance as a "non-trespassory invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts § 821 D (1979)("Restatement"). See State ex rel. Village of Los Ranchos De Albuquerque v. City of Albuquerque, 1994-NMSC-126, ¶ 51, 119 N.M. 150, 163, 889 P.2d 185, 198 (citing the Restatement's definition of private nuisance). The elements of private nuisance are:

General Rule. One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of the land, and the invasion is either

    (a)    intentional and unreasonable, or

> (b)    unintentional and otherwise actionable under the rules
> controlling liability for negligent or reckless conduct, or for
> abnormally dangerous conditions or activities.

Scott v. Jordan, 1983-NMCA-022, ¶ 12, 99 N.M. 567, 570, 661 P.2d 59, 62 (citing Restatement

(Second) of Torts § 822 (1979)).

Here, the Hermit's Peak/Calf Canyon Fire destroyed the Dolan Plaintiffs' property and

most of their personal possessions, see Dolan Complaint ¶ 9, at 5, and the Hermit's Peak/Calf

Canyon Fire and its resulting flooding damaged the Lands Plaintiffs' property, see Lands

Complaint ¶¶ 4-5, at 2-3.  The Hermit's Peak/Calf Canyon Fire thus constitutes an invasion into

the Plaintiffs' land.  Next, because the Forest Service lost control of its prescribed burns in the

Santa Fe National Forest in San Miguel County, which caused the Hermit's Peak/Calf Canyon

Fire, see Hermit's Peak Act § 102(a)(2)-(3), the Court concludes that the Forest Service's invasion

is unintentional, cf. Padilla v. Lawrence, 1984-NMCA-064, ¶ 10, 101 N.M. 556, 560, 685 P.2d

964, 968 (finding that the defendant's invasion of the plaintiffs' land was intentional, because the

defendants knew or should have known that their conduct in operating the soil plant interfered

with the plaintiffs' use and enjoyment of their land).[19]

Next, the Court determines that the Forest Service's unintentional invasion is negligent,

reckless, and abnormally dangerous activity.    See Restatement (Second) of Torts § 822.

---

[19]The Court predicts that the Supreme Court of New Mexico would agree with the Court
of Appeals of New Mexico's conclusion in Padilla v. Lawrence, 1984-NMCA-064, ¶ 10, 101 N.M.
556, 560, 685 P.2d 964, 968, because the Supreme Court of New Mexico previously cites to Padilla
v. Lawrence's statements of nuisance law, including that "[i]n the nuisance context, an intentional
invasion is unreasonable if the gravity of the harm outweighs the utility of the actor's conduct,"
Cooper v. Chevron U.S.A., Inc., 2002-NMSC-020, ¶ 33, 132 N.M. 382, 393, 49 P.3d 61, 72 (citing
Padilla v. Lawrence, 1984-NMCA-064, ¶ 10, 101 N.M. at 560, 685 P.2d at 968).  The Supreme
Court of New Mexico, therefore, likely would agree that the gravity of the harm of the soil plant's
operations which interfere with the plaintiffs' use and enjoyment of their land outweigh those
operations' utility.

"Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 47-48, 73 P.3d 181, 186. Here, the Forest Service's conduct was negligent, because the Forest Service has a duty to not damage people's property and breached that duty by failing to contain a prescribed burn and allowing a dormant pile burn to reemerge. The Forest Service's mismanagement of forest fire activity creates an unreasonable risk of harm. Further, the resulting damage to federal and non-federal land, destruction of property, and displacement of people significantly outweighs any benefit of the prescribed burn and the dormant burn pile. See Hermit's Peak Act § 102(a)(2)-(3). Next, recklessness "is the intentional doing of an act with utter indifference to the consequences." NM Civil UJI NMRA 13-1827. Further, "[w]hen there is a high risk of danger, conduct that breaches the duty of care is more likely to demonstrate recklessness." NMRA 13-1827. Here, because prescribed burns and pile burns have a high risk of danger and high risk of forest fires, the Forest Service's conduct of mismanagement demonstrates recklessness. The Forest Service knows that mismanagement of its forest fires can lead to unreasonable risk of harm; it has prescribed burn policies to prevent harm. Yet the Forest Service failed to contain a prescribed burn and allowed a dormant pile burn to reemerge. As a result of the Hermit's Peak Fire, Forest Service Chief Randy Moore ordered a three-months long review of its prescribed burn policies. See Hermit's Peak Act § 102(a)(8). The Court, therefore, concludes that the Forest Service's instigation of the Hermit's Peak/Calf Canyon Fire is an invasion of the Plaintiffs' land that constitutes recklessness, because the Forest Service mismanages its forest fires even knowing that mismanagement can create an unreasonable risk of harm. Finally, the Forest Service's conduct is also "abnormally dangerous" activity. Restatement

(Second) of Torts § 822.  The Supreme Court of New Mexico defines "abnormally dangerous activities" under the Restatement as "situations where the risks involved cannot be eliminated by the exercise of reasonable care, or even the utmost care." Saiz v. Belen School Dist., 1992-NMSC-018, ¶ 22, 113 N.M. 387, 397, 827 P.2d 102, 112 ("Saiz").  While the Supreme Court of New Mexico previously only has applied the "abnormally dangerous" activity classification to the use of explosives in blasting, Saiz, 1992-NMSC-018, ¶ 22, 113 N.M. at 397, 827 P.2d at 112, the Court predicts it would apply the classification in other circumstances.  The Honorable Juan Guerrero Burciaga, then Chief Judge of the United States District Court for the District of New Mexico, explains:

> Therefore, the New Mexico Supreme Court's statement in Saiz, "Application of the ultrahazardous activity doctrine has been restricted in [New Mexico] decisions to the use of explosives in blasting," [1992-NMSC-018, ¶ 22, 113 N.M. at 397, 827 P.2d at 112], must be construed merely as an historical observation, not a substantive limitation on strict liability doctrine. The court, by this dicta, did not, and could not have intended to, forever freeze the development of strict liability doctrine in New Mexico. That "New Mexico has not yet recognized the theory of a landowner's strict liability except [in blasting cases]," Ruiz [v. Southern Pacific Transportation Co., 1981-NMCA-094, 97 N.M. 194, 200, 638 P.2d 406, 412], does not necessarily mean that New Mexico will never recognize strict liability outside the blasting context.

Schwartzman, Inc., v. Atchison, Topeka & Santa Fe Ry. Co., 842 F. Supp. 475, 478 (D.N.M. 1993)(Burciaga, C.J.).  Setting fire to a forest, even when following the utmost care under prescribed fire policy and safety protocol, creates risks similar to setting off explosives.  Here, the Forest Service's prescribed burn and burn pile are abnormally dangerous activities and conditions. The Court, therefore, concludes that the Forest Service's instigation of the Hermit's Peak/Calf Canyon Fire is a nuisance under New Mexico State law because it is a negligent and reckless invasion, and is abnormally dangerous activity.

2.    **New Mexico State Law Allows Recovery of Noneconomic Damages Under Private Nuisance**.

New Mexico law provides that plaintiff property owners in a private nuisance action can recover damages for discomfort and annoyance.  See Aguayo v. Village of Chama, 1969-NMSC-005, ¶ 7, 79 N.M. 729, 731, 449 P.2d 331, 333 ("Aguayo")(explaining that damages for discomfort and annoyance are recoverable separate from any diminution in property value).  In Aguayo, the plaintiffs seek noneconomic damages for nuisance when a village dumps raw sewage into a lagoon within the plaintiffs' property, which causes foul odors and results in the plaintiffs' discomfort and annoyance.  See 1969-NMSC-005, ¶ 9, 79 N.M. at 732, 449 P.2d at 334.  There, the Supreme Court of New Mexico explains:

> It is for the trier of the facts to determine the amount of damages, in view of the discomfort or annoyance to which the plaintiffs have been subjected.  As to . . . special damages, there need not be testimony of any witness as to the amount in dollars and cents necessary to compensate plaintiffs.  The amount, to be determined from the evidence concerning the annoyance and discomfort, is usually within the sound discretion of the trier of the facts.

Aguayo, 1969-NMSC-005, ¶ 8, 79 N.M. at 732, 449 P.2d at 334.  The Supreme Court of New Mexico reverses the lower court's failure to enter findings -- one way or the other -- regarding annoyance and comfort damages for the plaintiffs' nuisance claim.  See 1969-NMSC-005, ¶ 11, 79 N.M. at 732, 449 P.2d at 334.  The Supreme Court of New Mexico's conclusion that the fact finder must determine the amount of noneconomic damages for discomfort or annoyance for nuisance is consistent with the Restatement, which establishes a baseline recognition of recovery of damages for "discomfort and annoyance" resulting from the defendant's nuisance.  Restatement (Second) of Torts § 929(1).  The Restatement states that "[d]iscomfort and annoyance to an occupant of the land and to the members of the household are distinct grounds of compensation for which in ordinary cases the person in possession is allowed to recover in addition to the harm

to his proprietary interests."  Restatement (Second) Torts, § 929(1).  The Court predicts that the Supreme Court of New Mexico would follow the Restatement to allow explicit recovery of noneconomic damages for "discomfort and annoyance" resulting from nuisance.  The Supreme Court of New Mexico previously has cited to the Restatement to define private nuisance, see State ex rel. Village of Los Ranchos De Albuquerque v. City of Albuquerque, 1994-NMSC-126, ¶ 51, 119 N.M. at 163, 889 P.2d at 198; Cooper v. Chevron U.S.A., Inc., 2002-NMSC-020, ¶ 26, 132 N.M. at 390, 49 P.3d at 69 (Serna, C.J., Dissenting), and New Mexico courts often look to the law as stated in the Restatement, see Montanez v. Cass, 1975-NMCA-142, ¶ 39, 89 N.M. at 38, 546 P.2d at 1195 ("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."),[20] Schmitz v. Smentowski, 1990-NMSC-002, ¶ 49, 109 N.M. at 393, 785 P.2d at 736 ("We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas.").  In Padilla v. Lawrence, 1984-NMCA-064, 101 N.M. 556, 685 P.2d 964 ("Padilla"), the Court of Appeals of New Mexico affirms the trial court's award to the plaintiffs of damages for annoyance, discomfort, and inconvenience, among other things, in a lawsuit against a soil manufacturing plant.  See 1984-NMCA-064, ¶ 15-16, 101 N.M. at 561, 685 P.2d at 969.  In Padilla, the plaintiffs sue for private nuisance, among other tort claims, due to the soil manufacturing plant's operation which exposes plaintiffs to new odors of a dead animal, of a

---

[20]The Court thinks that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico in Montanez v. Cass, 1975-NMCA-142, ¶ 39, 89 N.M. at 38, 546 P.2d at 1195, and conclude that New Mexico tort law follows the Restatement, because the Supreme Court of New Mexico frequently cites to the Restatement for tort rule statements.  See, e.g., Saiz v. Belen Sch. Dist., 1992-NMSC-018, ¶¶ 1-46, 113 N.M. 387, 387-403, 827 P.2d 102, 102-18 (citing Restatement § 409 for liability of an employer of an independent contractor, § 413 for the definition of "peculiar risks" and "special danger," § 416 for liability of an employer of an independent contractor for physical harm caused by failure to exercise reasonable care, § 426 for the nonliability of an employer for "collateral" negligence of an independent contractor, § 427 for liability for inherently dangerous activities.

pig pen, and of rotten fish, as well as dust, noise, and flies.  See 1984-NMCA-064, ¶¶ 1, 6, 101 N.M. at 558-59, 685 P.2d at 966-67.  The odors prohibit the plaintiffs from cooking in the summer and using evaporative cooling, generally interfere with normal residential activities, and lead the plaintiff to have nosebleeds and "fits of choking."  1984-NMCA-064, ¶ 6, 101 N.M. at 559, 685 P.2d at 967.  The plant also causes the plaintiffs to move away from their residence of twenty-five years.  See 1984-NMCA-064, ¶ 13, 101 N.M. at 560, 685 P.2d at 968.  The Court of Appeals of New Mexico holds that the trial court does not abuse its discretion in determining damages for annoyance, discomfort, and inconvenience for a private nuisance claim.  See 1984-NMCA-064, ¶ 17, 101 N.M. at 561, 685 P.2d at 969.  The Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico, and agree with the trial court's award of noneconomic damages of annoyance, discomfort, and inconvenience for private nuisance in Padilla, 1984-NMCA-064, ¶ 17, 101 N.M. at 561, 685 P.2d at 969.  Allowing recovery of noneconomic damages award for discomfort and annoyance for private nuisance is consistent with the Second Restatement of Torts § 929(1), and the Supreme Court of New Mexico states in Aguayo that determination of damages for discomfort or annoyance are "within the sound discretion of the trier of the facts."  1969-NMSC-005, ¶ 8, 79 N.M. at 732, 449 P.2d at 334.

The Court does not agree with the Attorney General of New Mexico's Opinion which notes that it is "unlikely" that a noneconomic damage award for nuisance or trespass "would be permitted based solely on emotional distress."  In Re: Opinion Request - Noneconomic Damages for Nuisance and Trespass at 2, Opinion No. 2024-05, New Mexico Department of Justice (March 7, 2024)("AG Opinion").  On March 7, 2024, Assistant Solicitor General of New Mexico Ellen Venegas wrote an opinion of behalf of Raul Torrez, Attorney General of New Mexico, to The Honorable Michael Padilla, Majority Whip, and The Honorable Pete Campos, both of the New

Mexico State Senate, addressing the question of whether noneconomic damages are available under trespass and nuisance in New Mexico in response to the ongoing litigation in Lands and Dolan, among other similar cases. See AG Opinion at 1. The AG Opinion cites a Court of Appeals of New Mexico decision that denies the jury's award of emotional damages award from a public sewer-system backup that damaged the plaintiffs' home. See Castillo v. City of Las Vegas, 2008-NMCA-141, ¶¶1-2, 145 N.M. 205, 206, 195 P.3d 870, 871. There, the Court of Appeals of New Mexico explains that the "narrow circumstances" where New Mexico courts permit emotional distress damages do not include the plaintiffs' claim for negligent damage to property. Castillo v. City of Las Vegas, 2008-NMCA-141, ¶ 21, 145 N.M. at 210, 195 P.3d at 875. The Court thinks that the Supreme Court of New Mexico, consistent with its own holding in Aguayo, would conclude that plaintiffs may recover for any discomfort and annoyance resulting from the sewage backup, and that the determination of such noneconomic damages is for the fact finder. Furthermore, the Court of Appeals of New Mexico's holding in Castillo v. City of Las Vegas is not persuasive because there, the court ultimately concludes that the economic damages award of $30,000.00 adequately compensates the plaintiffs' loss of property damage. See 2008-NMCA-141, ¶ 28, 145 N.M. at 212, 195 P.3d at 877. The Court of Appeals, therefore, ignores that recovery for discomfort and annoyance can be "in addition to the harm to [the plaintiffs'] proprietary interests," Restatement (Second) Torts, § 929(1), and that damages for discomfort or annoyance is "within the sound discretion of the trier of the facts," Aguayo, 1969-NMSC-005, ¶ 8, 79 N.M. at 732, 449 P.2d at 334.

Additionally, the AG Opinion cites to New Mexico v. General Electric Co., 335 F. Supp. 2d 1185 (D.N.M. 2004)(Jenkins, J.), aff'd in part and appeal dismissed in part, New Mexico v. General Electric Co., 467 F.3d 1223, 1223 (10th Cir. 2006)("New Mexico v. G.E. II"). There, the

Honorable Bruce S. Jenkins, United States District Court Judge for the United States District Court for the District of New Mexico, concludes that New Mexico law does not permit compensatory damages for public nuisance.  See New Mexico v. General Electric Co., 335 F. Supp. 2d at 1242. The Supreme Court of New Mexico adopts the Restatement's definition of public nuisance as an "unreasonable interference with a right common to the general public." State ex re. Village of Los Ranchos De Albuquerque v. City of Albuquerque, 1994-NMSC-126 ¶ 52, 119 N.M. 150, 163, 889 P.2d 185, 198 (quoting the Restatement (Second) of Torts, § 821B(1))("Los Ranchos").  Also in Los Ranchos, the Supreme Court of New Mexico states that common law public nuisance is similar to statutory public nuisance, which New Mexico defines as "anything affecting any number of citizens" that is "injurious to public health, safety, morals or welfare" or "interferes with the exercise and enjoyment of public rights, including the right to use public property."  New Mexico Statutes Annotated § 30-8-1.   In contrast to public nuisance, which concerns the general public, here, the Plaintiffs only assert private nuisance, which concerns an individual person's property. Furthermore, the Tenth Circuit's decision of the case on appeal in New Mexico v. G.E. II, does not review the issue of whether New Mexico law permits compensatory damages for public nuisance.  Rather, the Tenth Circuit dismisses the State plaintiff's public nuisance claim, among others, for lack of jurisdiction under 42 U.S.C. § 9613(h).  See New Mexico v. G.E. II, 467 F.3d at 1252.  Had the Tenth Circuit interpreted New Mexico law on public nuisance in that case, the Court as a federal district court would be bound to conclude that the Tenth Circuit's reflection of New Mexico's then-existing body of law is accurate.  Regardless, because the Plaintiffs only assert private nuisance, neither the district court case nor the Tenth Circuit case are on point here because they only concern public nuisance.  The Court, thus, does not rely on them.

Here, following the Restatement, the Supreme Court of New Mexico's reasoning in Aguayo, and the Court of Appeals of New Mexico's reasoning in Padilla, the Court concludes that noneconomic damages for pain and suffering, discomfort, annoyance, and inconvenience as a result of the Hermit's Peak/Calf Canyon Fire can be recoverable under a private nuisance claim. Like the operation of the plant that causes odors and relocation in Padilla, here, the Forest Service's instigation of the Hermit's Peak/Calf Canyon Fire, see Hermit's Peak Act § 102(a), results in evacuations and property destruction in the surrounding areas, see Hermit's Peak Act § 102(a)(5); § 102(a)(9). The Hermit's Peak/Calf Canyon Fire results in fire and flooding damage to the Plaintiffs' property, prohibits them from the use and enjoyment of their land, and ultimately forces them to relocate. See Dolan Complaint ¶ 9, at 5; Lands Complaint ¶¶ 4-5, at 2-3. The Plaintiffs allege pain and suffering as a result of the damage to their property and possessions. See Lands Complaint ¶¶ 4-5, at 2-3. Under the Restatement, these noneconomic damages are recoverable in addition to the harm to the Plaintiffs' proprietary interests. See Restatement (Second) Torts, § 929(1). The Court concludes that the Plaintiffs can recover for noneconomic damages such as annoyance, discomfort, and inconvenience that result from the Hermit's Peak/Calf Canyon Fire, which constitutes a nuisance under New Mexico State law.

**C.    THE PLAINTIFFS CAN RECOVER NONECONOMIC DAMAGES FOR TRESPASS, BECAUSE THE HERMIT'S PEAK/CALF CANYON FIRE DESTROYED THE PLAINTIFFS' PROPERTY.**

First, the Court predicts that the Supreme Court of New Mexico would adopt the Restatement's definition and elements of trespass, which are also consistent with the Court of Appeals of New Mexico's definition of trespass in several cases. Second, the Court concludes that the Hermit's Peak/Calf Canyon Fire constitutes trespass, because it is a negligent, reckless, and extra hazardous entry onto the Plaintiffs' land. Third, the Court concludes that noneconomic

damages are recoverable for trespass claims under New Mexico State law. The Court, therefore, concludes that the Plaintiffs can recover noneconomic damages under the claim that the Hermit's Peak/Calf Canyon Fire is a trespass.

### 1. The Court Predicts That the Supreme Court of New Mexico Would Adopt the Restatement's Definition of Trespass and the Restatement's Elements of Trespass.

The Supreme Court of New Mexico has not defined trespass under New Mexico State law, but the Court of Appeals of New Mexico has defined trespass in several cases. In Padilla, the Court of Appeals of New Mexico defines trespass as a direct infringement of another's right of possession and notes that it is the cause of action for physical invasions of property. See 1984-NMCA-064, ¶ 26, 101 N.M. at 563, 685 P.2d at 971 (citing Wilson v. Interlake Steel Co., 32 Cal.3d 229, 185 Cal. Rptr. 280, 649 P.2d 922 (1982)(concluding that the blowing of particulate matter onto a property is actionable as trespass only upon finding the particulate matter settled upon and damaged the plaintiff's property). The AG Opinion cites two additional Court of Appeals of New Mexico cases that define trespass. See AG Opinion at 2 (citing North v. Pub. Serv. Co. of New Mexico, 1980-NMCA-031, ¶ 4, 94 N.M. 246, 608 P.2d 1128 ("Every unauthorized entry upon the land of another is a trespass which entitles the owner to a verdict for some damages."); Holcomb v. Rodriguez, 2016-NMCA-075, ¶ 12, 387 P.3d 286, 291 (explaining that nominal damages are available in actions for trespass)).[21] The Court predicts that the Supreme Court of

---

[21]The AG Opinion cites only to Holcomb v. Rodriguez, but in that case, the Court of Appeals of New Mexico cites to Atchinson, Topeka & Santa Fe Ry. v. Richter, 1915-NMSC-008, ¶ 36, 20 N.M. 278, 296, 148 P. 478, 483, to conclude that nominal damages are available in actions for trespass. In Atchinson, Topeka & Santa Fe Ry. v. Richter, the Supreme Court of New Mexico explains that if a trespasser's "entry be by a naked, technical trespass, he may certainly have nominal damages," and if the "entry be by violence, and personal injury be done the owner, he certainly may have actual damages and, in some instances, no doubt, exemplary or punitive damages." 1915-NMSC-008, ¶ 36, 20 N.M. at 296, 148 P. at 483. The Court, therefore, concludes that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's

New Mexico would agree with the Court of Appeals of New Mexico's characterization of trespass in Padilla, 1984-NMCA-064, ¶ 26, 101 N.M. at 563, 685 P.2d at 971, and in North v. Public Service Co. of New Mexico, 1980-NMCA-031, ¶ 4, 94 N.M. 246, 608 P.2d 1128, because they are consistent with the Restatement, and as stated previously, the New Mexico courts often look to the law as stated in the Restatement, see Montanez v. Cass, 1975-NMCA-142, ¶ 39, 89 N.M. 32, 38, 546 P.2d 1189, 1195 ("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."). Accord Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F. Supp. 2d 1145, 1177 n.24 (D.N.M.2011)(Browning, J.); Schmitz v. Smentowski, 1990-NMSC-002 ¶ 49, 109 N.M. at 393, 785 P.2d at 736 ("We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas.").

The Restatement describes a "Trespass on Land" as "invasions of the interest in the exclusive possession of land and its physical condition." Restatement (Second) Torts, Chapter 7, §§ 157-166. The Restatement classifies three different "Trespass[es] on Land": (i) intentional entries on land, Restatement (Second) Torts § 158; (ii) reckless or negligent entries on land and those resulting from extra hazardous activities, see Restatement (Second) Torts § 165; and (iii) accidental entries on land, see Restatement (Second) Torts § 166. Because the Court predicts that the Supreme Court of New Mexico would adopt the Restatement's definition and elements of trespass and also follow the Court of Appeals of New Mexico in doing so, the Court analyzes whether the Hermit's Peak/Calf Canyon Fire is a trespass according to the Restatement.

---

conclusion in Holcomb v. Rodriguez that nominal damages are available in actions for trespass. See 2016-NMCA-075, ¶ 12, 387 P.3d at 291. The Court, however, notes that nominal damages are irrelevant here, because the Plaintiffs do not seek nominal damages.

2.      **The Hermit's Peak/Calf Canyon Fire is a Trespass Under New Mexico State Law.**

The Plaintiffs assert merely that that the Hermit's Peak/Calf Canyon Fire constitutes trespass, because it causes "flames, smoke, soot, or ash to invade property in New Mexico," but do not specify which trespass nor establish elements for trespass. Dolan Motion at 18. The United States does not make a counterargument. As to the Restatement's first trespass, a person is liable for intentional trespass "if he intentionally . . . enters land in the possession of [another], or causes a thing or a third person to do so." Restatement (Second) of Torts § 158(a). Here, there is no evidence that the Forest Service intentionally started the Hermit's Peak/Calf Canyon Fire to enter the Plaintiffs' property. Rather, the Forest Service meant to conduct operations only on Federal land in San Miguel County: the prescribed burn in Santa Fe National Forest became the Hermit's Peak/Calf Canyon Fire, and the dormant pile burn became the Calf Canyon Fire. See Hermit's Peak Act § 102(a). Furthermore, the Hermit's Peak/Calf Canyon Fire is unlike the types of intentional trespass that the Restatement intends to dictate. See Restatement (Second) § 158, Illustrations 3-6. The Restatement's examples of intentional trespass include a person intentionally throwing a pail of water against another person's house, intentionally driving a stray horse into the neighbor's pasture, intentionally constructing a dam that causes water to back up and flood another person's land, and intentionally discharging a shotgun over another person's land. See Restatement (Second) § 158, Illustrations 3-6. In contrast, here, while the Forest Service intentionally creates the initial fires, it does not do so with the intent to lose control, start a wildfire, and spread the fires beyond federal land. The Court, therefore, concludes that the Plaintiffs do not have a claim for intentional trespass.

Second, under trespass liability resulting from negligent or reckless conduct, or from an ultrahazardous activity, "the nature of the conduct removes the need to establish intent, which is

ordinarily an element of a trespass case, because the conduct creates an unreasonable risk resulting in the invasion of a possessory interest in land."  Louis R. Frumer & Melvin I. Friedman, <u>Personal Injury: Actions, Defenses, Damages</u> § 138.05 (2024).  <u>See</u> Restatement (Second) of Torts § 165, comment b.  Here, the Forest Service lost control of a prescribed burn on federal land in Santa Fe National Forest that turned into a wildfire, and also did not manage properly a pile burn from January, 2022, that remained dormant under the surface, but then reemerged and also turned into a wildfire.  <u>See</u> Hermit's Peak Act § 102(a)(1)-(5).  The Court concludes, as it does in the previous section on nuisance, that the Forest Service's conduct was negligent and reckless.  As the Court notes in the previous section on nuisance, Forest Service Chief Randy Moore ordered a ninety-day review of its prescribed burn policies, and the Forest Service even assumed responsibility for causing the Hermit's Peak/Calf Canyon Fire.  <u>See</u> Hermit's Peak Act § 102(a)(8).  Also, for the same reasons the Court states in the previous section on nuisance, the Forest Service's conduct is abnormally dangerous and extra hazardous activity, because prescribed fires create similar unreasonable risks as explosives.  <u>See</u> Restatement (Second) of Torts § 822.  Next, the Hermit's Peak/Calf Canyon Fire is an invasion of the Plaintiffs' possessory interest in their land, because it physically enters the Plaintiffs' land and destroys homes, possessions, and trees on the land.  <u>See</u>, <u>e.g.</u>, <u>Dolan</u> Complaint ¶¶ 10-11, at 6-7.  The Court, therefore, concludes that because the Forest Service's conduct is negligent and reckless, and an extra hazardous activity, and because the Hermit's Peak/Calf Canyon Fire physically invaded the Plaintiffs' land, the Hermit's Peak/Calf Canyon Fire is a trespass under New Mexico State law.

### 3.     <u>Noneconomic Damages are Recoverable for Trespass Claims Under New Mexico State Law.</u>

The Court next predicts that the Supreme Court of New Mexico would conclude that a plaintiff can recover noneconomic damages for discomfort, annoyance, and inconvenience under

a trespass claim.  Unlike nuisance claims, New Mexico courts have not yet held that a plaintiff can

recover such noneconomic damages.  New Mexico State courts, however, consider trespass and

nuisance within the same species of legal claims, see Kaywal, Inc. v. Avangrid Renewables, LLC,

2021-NMCA-037, ¶ 42, 495 P.3d 550, 569 ("Private nuisance is akin to trespass: it is an in

personam action for tortious interference with one's use and enjoyment of land."),[22] and the Court

concludes above, see supra at Section II.B., that noneconomic damages are recoverable for

nuisance.  Furthermore, the Restatement explains that a trespasser's liability "include[s] mental

suffering of the possessor and the members of his household, and its physical consequences."

Restatement (Second) of Torts § 162 Reporter's Notes.  In Padilla, the Court of Appeals of New

Mexico stops short of deciding whether noneconomic damages are available for a trespass claim

when it concludes that the plaintiffs do not establish trespass because there is no evidence that the

plant's dust blew onto the plaintiffs' property.  See Padilla, 1984-NMCA-064, ¶¶ 26-27, 101 N.M

at 563, 685 P.2d at 971.  Had the Court of Appeals of New Mexico concluded that the evidence

establishes trespass, the Court predicts that the Court of Appeals of New Mexico next would follow

the Restatement to allow the plaintiffs to recover for noneconomic damages resulting from that

trespass.  Other courts similarly conclude that that damages for mental distress are recoverable

under trespass.  In In Re: Gold King Mine Release in San Juan County, Colorado, On August 5,

2015, No. CIV 18-2824 WJ, No. 17-0710-WJ/SCY, No. CIV 18-0744 WJ/KK, 2022 WL 3279341,

---

[22]The Court thinks that the Supreme Court of New Mexico would agree with the Court of
Appeals of New Mexico in Kaywal, Inc. v. Avangrid Renewables, LLC, 2021-NMCA-037, ¶ 42,
495 P.3d 550, 569, and conclude that private nuisance is akin to trespass, because the Supreme
Court of New Mexico addresses them similarly.  See Budagher v. Amrep Corp., 1981-NMSC-121,
¶ 16, 97 N.M. 116, 121, 637 P.2d 547, 552 (holding that the obstruction and diversion of the flow
of natural water causing injury to property "has been held to be a private nuisance" and "also has
been held to be a trespass"); Carlsbad Irrigation Dist. v. Cobble, 1942-NMSC-042 ¶ 32, 46 N.M.
335, 342, 128 P.2d 1047, 1052 ("the injury resulting from a nuisance or a trespass upon real
property is continuous in its nature. . . ").

at *2 (D.N.M. August 11, 2022)(Johnson, C.J.)("Gold King Mine"), the Honorable William P.

Johnson, Chief Judge of the United States District Court Judge for the District of New Mexico,

notes that Colorado State courts permit recovery for annoyance and discomfort damages on

nuisance and trespass claims, although those cases involve only Colorado State substantive law

and not New Mexico State substantive law.  See Gold King Mine, 2022 WL 3279341 at *2 (first

citing Calavaresi v. National Development Co., 772 P.2d 640 (Colo. App. 1988)(stating that, in an

action for tortious injury to land, the plaintiffs are entitled to put on evidence to establish

discomfort, annoyance, physical illness, and loss of use and enjoyment of property); and then citing

Slovek v. Board of County Commissioners, 697 P.2d 781, 783 (Colo. App. 1984)(holding that

damages for annoyance and discomfort are available in a trespass claim.)).  At least two United

States Courts of Appeals also allow recovery of noneconomic damages for trespass.  See

Hammond v. County of Madera, 859 F.2d 797, 804 (9th Cir. 1988))(citing Gavcus v. Potts, 808

F.2d 596, 597 (7th Cir. 1986)("A trespasser is liable in damages for all injuries proximately

flowing from his trespass.  If a trespass causes mental distress, the trespasser is liable in damages

for the mental distress and for any resulting illness or physical harm.").  Despite the lack of clear

New Mexico State court decisions on the matter, the Court concludes that the Supreme Court of

New Mexico would allow recovery of noneconomic damages under trespass, based on the

Restatement, how other courts treat trespass, and because New Mexico State courts view trespass

as akin to nuisance.  FEMA has not presented any cases to the contrary.  The Plaintiffs, therefore,

can recover noneconomic damages for emotional pain and suffering under trespass, because the

Hermit's Peak/Calf Canyon Fire is a trespass and the Hermit's Peak Act allows recovery of

damages for trespass under New Mexico State law.

### D.    THE PLAINTIFFS CAN RECOVER FOR NONECONOMIC DAMAGES FOR PERSONAL INJURY UNDER NEW MEXICO STATE LAW.

The Lands Plaintiffs seek recovery of noneconomic damages resulting from personal injury. See Lands Motion at 15.  All roads of the law converge to conclude that, in New Mexico, plaintiffs can recover noneconomic damages for personal injury actions.  First, the Restatement permits plaintiffs with tort claims for "harms to the person" to recover damages, among others, for "bodily harm and emotional distress."   Restatement (Second) of Torts § 924.   As the Court discusses previously, New Mexico courts follow generally the Restatement.  See Montanez v. Cass, 1975-NMCA-142, ¶ 39, 89 N.M. 32, 38, 546 P.2d 1189, 1195 ("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d.").  Accord Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F. Supp. 2d at 1177 n. 24; Schmitz v. Smentowski, 1990-NMSC-002, ¶ 49, 109 N.M. at 393, 785 P.2d at 736 ("We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas.").  Second, the NM Civil Jury Instructions include instructions for deciding the amount of damages for "[t]he pain and suffering experienced [and reasonably certain to be experienced in the future] as a result of the injury."  NMRA 13-1807.  Third, New Mexico State and federal courts applying New Mexico State law have allowed recovery for noneconomic damages for pain, suffering, and loss of enjoyment of life arising from personal injury.  In Morga v. Fedex Ground Package Sys., Inc., 2022-NMSC-013, 512 P.3d 774 ("Morga II"), the Supreme Court of New Mexico affirms a $61,000,000.00 jury award for a wrongful death and personal injury case, which includes noneconomic damages for pain and suffering.  ¶¶ 1, 8, 512 P.3d at 779-80.  The Supreme Court of New Mexico rejects the defendant's argument that the discrepancy between economic and noneconomic damages awards were "excessive," explaining that "economic loss does not always capture the severity of the injury in terms of the noneconomic consequences of that injury."  Morga

II, ¶ 28, 512 P.3d at 786 (second quote citing Herbert M. Kritzer, Guangya Liu, and Neil Vidmar,

An Exploration of "Noneconomic" Damages in Civil Jury Awards, 55 Wm. & Mary L. Rev. 971,

975 (2014)).  To emphasize the recoverability of noneconomic damages in an instance of personal

injury and wrongful death, the Supreme Court of New Mexico then notes that:

> New Mexico law specifically instructs juries to consider noneconomic damages apart from economic losses.  See [NM Civil Jury Instructions] 13-1830(4) NMRA (providing a separate line for a jury to award damages "apart from . . . decedent['s] earning capacity"); see also Gutierrez v. Kent Nowlin Const. Co., 1981-NMCA-107, ¶ 16, 99 N.M. 394, 658 P.2d 1121 (citing the jury instruction listing earning capacity as a separate element of damages as support for upholding an award greater than the proven economic damages), rev'd on other grounds, Kent Nowlin Const. Co. v. Gutierrez, 1982-NMSC-123, ¶ 2, 99 N.M. 389, 658 P.2d 1116.

Morga II, ¶32, 512 P.3d at 787.  Aligning with the Supreme Court of New Mexico's conclusion,

the Court, applying New Mexico State law, awards damages for "pain and suffering," among

others, as a result of injuries from a motor vehicle accident in Rawers v. United States, 545 F.

Supp. 3d 1087 (D.N.M. 2021)(Browning, J).  There, the Court finds an award of $764,759.24 for

"pain and suffering" reasonable because Rawers experienced "loss of enjoyment of life," including

no longer being able to enjoy cooking, exercising, bead work, and chores.  545 F. Supp. 3d at 1092.

Similarly, in Sheraden v. Black, the Court of Appeals of New Mexico upholds the trial court's

determination of total damages, including pain and suffering damages, explaining:

> Pain and suffering are proper elements of damages in personal injury actions.  See Vaca v. Whitaker, 86 N.M. 79, [86,] 519 P.2d 315 (Ct. App. 1974); see also SCRA 1986, 13-1807. There is no standard fixed by law for measuring the value of pain and suffering; rather, the amount to be awarded is left to the fact finder's judgment. See Strickland v. Roosevelt County Rural Elec. Coop., 99 N.M. 335, [340-41,] 657 P.2d 1184 (Ct. App. 1982), cert. denied, 463 U.S. 1209 [] (1983).

Sheraden v. Black, 1988-NMCA-016, ¶ 18, 107 N.M. 76, 81.  See Sena v. New Mexico State

Police, 1995-NMCA-003, ¶ 29, 119 N.M. 471, 477-78, 892 P.2d 604, 611 ("[W]e think it is clear

that New Mexico permits proof of nonpecuniary damages resulting from the loss of enjoyment of

life in tort actions involving permanent injuries.")(first citing <u>Romero v. Byers</u>, 1994-NMSC-031, ¶ 17, 117 N.M. 422, 428, 872 P.2d 840, 846; and then citing <u>Hoskie v. United States</u>, 666 F.2d 1353 (10th Cir. 1981)).  The Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's conclusions in <u>Sheraden v. Black</u>, 1988-NMCA-016, ¶ 18, 107 N.M. at 81, and <u>Sena v. New Mexico State Police</u>, 1995-NMCA-003, ¶ 29, 119 N.M. at 477-78, 892 P.2d at 611, because the Restatement and the NM Civil Jury Instructions permit recovery of noneconomic damages for personal injury actions.  FEMA presents no cases showing to the contrary that New Mexico State law does not provide recovery for noneconomic damages for personal injury actions, and even does not assert any response to the <u>Lands</u> Plaintiffs' personal injury argument.  The Court, therefore, concludes that, under the Hermit's Peak Act, the Plaintiffs can recover noneconomic damages for pain and suffering, and loss of enjoyment of life, resulting from personal injuries that the Hermit's Peak/Calf Canyon Fire cause.

### III.  "ACTUAL COMPENSATORY DAMAGES" UNDER § 104(C)(3) INCLUDES <u>NONECONOMIC DAMAGES.</u>

Even if the NM State law provision, § 104(c)(2), does not waive sovereign immunity for the Plaintiffs' federal claims which seek noneconomic damages, the Court concludes that the Extent of Damages provision, § 104(c)(3), separately allows the Plaintiffs to recover noneconomic damages.  The Extent of Damages provision provides that any payment under the Hermit's Peak Act is "limited to actual compensatory damages measured by injuries suffered."  Hermit's Peak Act § 104(c)(3)(A).  It then lists explicitly the excluded damages: (i) prejudgment interest, and (ii) punitive damages.  <u>See</u> Hermit's Peak Act § 104(c)(3)(B)(i)-(ii).  The Court concludes that the Extent of Damages provision includes noneconomic damages for two reasons.  First, the Hermit's Peak Act's purpose to compensate for injuries resulting from the Hermit's Peak Fire, and the parallel FTCA statute, suggest that the term "actual compensatory damages" in § 104(c)(3)

includes noneconomic damages.  Second, the explicit exclusion of prejudgment interest and punitive damages, but nothing else, indicates that the Court should not read into the statute any additional, unstated exclusions.

### A.    THE HERMIT'S PEAK ACT'S PURPOSE AND THE HERMIT'S PEAK ACT'S PARALLELS WITH THE FTCA SUGGEST THAT "ACTUAL COMPENSATORY DAMAGES" INCLUDES NONECONOMIC DAMAGES.

First, the parties dispute whether the term "actual compensatory damages" includes noneconomic damages, such as for emotional pain and suffering.  Hermit's Peak Act § 104(c)(3)(A).  FEMA's argument that "actual compensatory damages" excludes noneconomic damages relies heavily on Federal Aviation Administration v. Cooper, where the Supreme Court resolves a similar question regarding the term "actual damages" in the Privacy Act of 1974, 5 U.S.C. § 552a(g)(4)(A)("Privacy Act").  F.A.A. v. Cooper, 566 U.S. at 286-87.  The Privacy Act's civil remedy provision allows the recovery of "actual damages" for intentional or willful violations of the Privacy Act.  F.A.A. v. Cooper, 566 U.S. at 287.  There, plaintiff Stanmore Cooper sues the Federal Aviation Administration under the Privacy Act for sharing his HIV-positive status, along with other medical information, with other federal agencies.  F.A.A. v. Cooper, 566 U.S. at 288-89.  Cooper seeks noneconomic losses for mental and emotional harm, because the disclosure of his medical information causes him "humiliation, embarrassment, mental anguish, fear of social ostracism, and other severe emotional distress."  F.A.A. v. Cooper, 566 U.S. at 289. The Supreme Court holds that the Privacy Act's term "actual damages" does not authorize unequivocally an award of damages for mental or emotional distress, and accordingly, the Privacy Act does not waive the United States' sovereign immunity for such harms.  F.A.A. v. Cooper, 566 U.S. at 304.

FEMA argues that, just like the Privacy Act's "actual damages" in F.A.A. v. Cooper, the Hermit's Peak Act's "actual compensatory damages" provision cannot allow noneconomic damages. Dolan Response at 13.   FEMA oversimplifies, however, the Supreme Court's conclusion.   The Supreme Court emphasizes the "unmistakable point that the term 'actual damages' can include nonpecuniary[23] loss" in the context of other statutes and "takes on different meanings in different contexts." F.A.A. v. Cooper, 566 U.S. at 300 (emphasis in original).   The Supreme Court points to a litany of statutes and caselaw that interprets "actual damages" as including nonpecuniary, or noneconomic, harm.  566 U.S. at 292.  For example, several United States Courts of Appeals interpret "actual damages" in the remedial provisions of the Fair Housing Act, 42 U.S.C. § 3613(c), and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681n, 1681o, as including compensation for mental and emotional distress.  F.A.A. v. Cooper, 566 U.S. at 292-93 (citing Steele v. Title Realty Co., 478 F.2d 380, 384 (10th Cir. 1973)(stating that damages under the Fair Housing Act "are not limited to out-of-pocket losses but may include an award for emotional distress and humiliation"); Thompson v. San Antonio Retail Merch. Ass'n, 682 F.2d 509, 516-14 (5th Cir. 1982)(per curiam)(explaining that, "[e]ven when there are no out-of-pocket expenses, humiliation and mental distress do constitute recoverable elements of damage" under the Fair Credit Reporting Act); Millstone v. O'Hanlon Reports, Inc., 528 F.2d 829, 834-35 (8th Cir. 1976)(approving an award of damages under the Fair Credit Reporting Act for "loss of sleep, nervousness, frustration and mental anguish"); Seaton v. Sky Realty Co., 491 F.2d 634, 636-38

---

[23]The Supreme Court treats the words "pecuniary" and "economic" as synonymous, because, in F.A.A. v. Cooper, it concludes that "we adopt an interpretation of 'actual damages' limited to proven pecuniary or economic harm."  566 U.S. at 299.  It logically follows that the Supreme Court, therefore, also treats nonpecuniary and noneconomic as synonymous.  The Court frames the Supreme Court's use of the words pecuniary and nonpecuniary in terms of economic and noneconomic to be consistent with its use of the latter terms throughout its Memorandum Opinion and Order.

(7th Cir. 1974)(authorizing compensatory damages under the Fair Housing Act for humiliation)). On the other hand, the Supreme Court also identifies instances where the term "actual damages" means only pecuniary or economic harm. F.A.A. v. Cooper, 566 U.S. at 293 (citing 28 U.S.C. § 3674, ¶ 2 (authorizing, under the FTCA's wrongful-death provision, "actual or compensatory damages, measured by the pecuniary injuries resulting from such death"); Mackie v. Rieser, 296 F.3d 909, 917 (9th Cir. 2002)(holding that "hurt feelings" over the nature of the infringement have no place in the actual damages calculus); Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 215 (9th Cir. 1985)(defining "actual damages" in the Copyright Act of 1909, 17 U.S.C. § 101(b)(1970 ed.), as "the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement"); Osofsky v. Zipf, 645 F.2d 107, 111 (2d Cir. 1981)(stating that the purpose of § 78bb(a) "is to compensate civil plaintiffs for economic loss suffered as a result of wrongs committed in violation of the 1934 Act"); Ryan v. Foster & Marshall, Inc., 556 F.2d 460, 464 (9th Cir. 1977)(construing "actual damages" in the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a), to mean "some form of economic loss."); Herpich v. Wallace, 430 F.2d 792, 810 (5th Cir. 1971)(noting that the "gist" of an action for damages under the Act is "economic injury.")). The Supreme Court ultimately cautions that "actual damages" has a "chameleon-like quality," and no "all-purpose definition" exists. F.A.A. v. Cooper, 566 U.S. at 294. Rather, courts "must consider the particular context in which the term appears." F.A.A. v. Cooper, 566 U.S. at 294.

The Supreme Court then determines whether the Privacy Act's use of "actual damages" allows recovery for nonpecuniary, or noneconomic damages. Specifically, the Supreme Court looks to the nature of damages recoverable under the parallel common-law torts of libel and slander, as well as Congressional intent. F.A.A. v. Cooper, 566 U.S. at 296-98. The Supreme

Court notes that because the Privacy Act "serves interests similar to those protected by defamation and privacy torts," Congress likely relied on those torts to draft the Privacy Act.  F.A.A. v. Cooper, 566 U.S. at 294-95.  The Supreme Court then explains that "[t]he basic idea is that Privacy Act victims, like victims of libel or slander, are barred from any recovery unless they can first show actual -- that is, pecuniary or material -- harm."  F.A.A. v. Cooper, 566 U.S. at 296.  The Supreme Court next explains that two categories of actual compensatory damages are recoverable in actions for "defamation and related dignitary torts":[24] general damages and special damages.  See 566 U.S. at 298 (citing 1 D. Haggard, Cooley on Torts § 164, p. 580 (4th ed. 1932)).  The Supreme Court also defines general and special damages:

> In defamation and privacy cases, "the affront to the plaintiff's dignity and the emotional harm done" are "called general damages, to distinguish them from proof of actual economic harm," which is called "special damages."

F.A.A. v. Cooper, 566 U.S. at 301 (citing Dan B. Dobbs, Law of Remedies, §3.2 at 139 (1973)). In common-law torts such as defamation, libel, and slander, special damages do not include mental or emotional distress.  See F.A.A. v. Cooper, 566 U.S. at 295-96 n. 6 (citing Restatement (Third) of Torts §575, Comment c ("The emotional distress caused to the person slandered by his knowledge that he has been defamed is not special harm and this is so although the distress results in a serious illness")).  See F.A.A. v. Cooper, 566 U.S. at 295.  The Supreme Court concludes that the Privacy Act, which serves a similar purpose as those torts, does not allow general damages for emotional harm, but rather only awards special damages for actual economic harm.  See F.A.A. v. Cooper, 566 U.S. at 296-97.  In looking to Congress' intent not to award general damages for

---

[24]Dignitary torts are torts that are invasions or deprivations of a person's dignity.  See Dan B. Dobbs, The Law of Torts § 514 (2d ed. 2021).  Dignitary torts "involve legally cognizable invasions of rights that stand independent of both physical and economic harms, that is, invasions of human dignity in the sense of human worth."  Dan B. Dobbs, The Law of Torts § 514.

emotional harm, the Supreme Court notes that Congress established a commission to determine whether the Privacy Act should allow the United States to be liable for general damages, but ultimately "left the question of general damages . . . for another day." F.A.A. v. Cooper, 566 U.S. at 298 (quoting Doe v. Chao, 540 U.S. 614, 622 (2004)(ellipses in original)).  The Supreme Court then concludes that, "[b]ecause Congress declined to authorize 'general damages,' we think it likely that Congress intended 'actual damages' in the Privacy Act to mean special damages for proven pecuniary loss."  F.A.A. v. Cooper, 566 U.S. at 298.  The Privacy Act's parallels to common-law libel and slander and Congress' intent to allow only pecuniary or economic damages, are "distinctive features" that establish that the Privacy Act does not authorize noneconomic damages for mental and emotional distress.  F.A.A. v. Cooper, 566 U.S. at 300.

Similarly, here, the term "actual compensatory damages" in the Hermit's Peak Act § 104(c)(3) has a "chameleon-like quality."  F.A.A. v. Cooper, 566 U.S. at 294.  Because the Court must consider "the particular context in which the term appears," F.A.A. v. Cooper, 566 U.S. at 294, the Plaintiffs' voluminous cites to caselaw adopting "all-purpose" interpretations of compensatory damages are not, when standing alone, decisive on the issue of whether compensatory damages include noneconomic damages.[25]  Context must be the thrust behind any "common-law meaning."  See Dolan Reply at 5.  Here, looking at the particular context of the Hermit's Peak Act, its purpose is to compensate victims of the Hermit's Peak/Calf Canyon Fire for tort "injury" -- as the FTCA defines "injury" -- resulting from the fire.  Hermit's Peak Act §§ 102(b), 103(5).  Just as the common-law torts of libel and slander parallel the Privacy Act, here,

---

[25]They are, however, decisive in helping the Court predict that the Supreme Court of New Mexico would conclude that "actual damages" or compensatory damages includes noneconomic damages, such as pain and suffering.  The Court addresses the caselaw's predictive value in the next section.

the Hermit's Peak Act parallels the FTCA for two reasons.  First, acceptance of payment under the Hermit's Peak Act constitutes a "complete release of all claims against the United States" under the FTCA.  Hermit's Peak Act § 104(e)(2).  Second, an injured person may seek compensation either by submitting a claim under the Hermit's Peak Act or by filing a claim under the FTCA. See Hermit's Peak Act § 104(h)(1).  Congress, therefore, intends that victims of the Hermit's Peak/Calf Canyon Fire can recover damages under either the Hermit's Peak Act or the FTCA. This nexus between the Hermit's Peak Act is longstanding; in United States v. Yellow Cab Co., the Supreme Court recognizes that the FTCA:

> does not subject the Government to a previously unrecognized type of obligation. Through hundreds of private relief acts, each Congress for many years has recognized the Government's obligation to pay claims on account of damage to or loss of property or on account of personal injury or death caused by negligent or wrongful acts of employees of the Government.

340 U.S. at 548-49.  The FTCA "waives the Government's immunity from suit in sweeping language."  United States v. Yellow Cab Co., 340 U.S. at 547.  It "unquestionably waives it in favor of an injured person."  United States v. Yellow Cab Co., 340 U.S. at 547.  The FTCA further provides that the United States is liable for tort damages to the same extent as a private person under the law where the tort occurred.  See 28 U.S.C. §§ 1346, 2674.  Just as the FTCA allows recovery of damages for the United States' torts against plaintiffs, so too does the parallel Hermit's Peak Act allow recovery of damages for FEMA's torts against the Plaintiffs for injuries resulting from the Hermit's Peak/Calf Canyon Fire.  FEMA notes in its own analysis of noneconomic damages that the Hermit's Peak Act requires it to "follow[] the Federal Tort Claims Act, 28 U.S.C. § 1346(b)('FTCA') when determining the substantive tort law applicable to paying claims." FEMA Legal Analysis of Noneconomic Damages.  Dolan AR at 2652.  And unlike the legislative history in F.A.A. v. Cooper that shows Congress considered but ultimately excluded recovery of

general damages, here, FEMA presents no evidence of any legislative history showing that Congress meant to exclude recovery of noneconomic damages. The Hermit's Peak Act, therefore, like the FTCA, waives sovereign immunity for noneconomic damages such as emotional pain and suffering.

The Plaintiffs also argue that the Hermit's Peak Act incorporates the FTCA, because the Hermit's Peak Act's definition of "injury" in § 103(5) incorporates the FTCA's use of the word "injury" in 28 U.S.C. § 1346(b)(1). Dolan Reply at 16. While the FTCA does not define "injury," it grants district courts' "exclusive jurisdiction of civil actions against the United States for injury or loss of property or personal injury or death . . . under circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). See Hatahley v. United States, 351 U.S. 173, 182 (1956)(explaining that, under the FTCA, the law of the State where the tortious act was committed determine damages). The Plaintiffs' theory, however, makes the tenuous assumption that merely borrowing the word "injury" from the FTCA more broadly imports the FTCA's waiver of sovereign immunity. The Court disposes with the Plaintiffs' argument. The Hermit's Peak Act's explicit incorporation of a single word "injury" does not support implicit incorporation of a capacious waiver of sovereign immunity. The Plaintiffs' better argument is that the Hermit's Peak Act's use of the term "actual compensatory damages" parallels the FTCA, which allows recovery of New Mexico State law damages including noneconomic damages. The Court also finds, nevertheless, that the Hermit's Peak Act waives sovereign immunity for New Mexico State law claims such as nuisance given the most practical reading of the NM State law provision, § 104(c)(2), which establishes that New Mexico State law applies to determine the Plaintiffs'

recoverable damages.  The Hermit's Peak Act allows recovery of noneconomic damages no matter which way the statutory interpretation cuts.

### B.    THE SUPREME COURT OF NEW MEXICO LIKELY WOULD DECIDE THAT COMPENSATORY DAMAGES INCLUDES NONECONOMIC DAMAGES.

While the Court concludes that "the particular context" in which the term "actual compensatory damages" appears in the Hermit's Peak Act includes noneconomic damages, F.A.A. v. Cooper, 566 U.S. at 294, additional State caselaw helps the Court predict that the Supreme Court of New Mexico would conclude that "actual damages" or compensatory damages includes noneconomic damages, such as pain and suffering.  The Court of Appeals of New Mexico previously has upheld a jury's compensatory damages award that includes noneconomic damages. See Morga v. Fedex Ground Package Sys., Inc., 2018-NMCA-039, ¶ 25, 420 P.3d 586, 596 ("Morga").  In Morga, the Court of Appeals of New Mexico upholds a jury's compensatory damages award of $165 million for personal injury and wrongful death, among other claims, resulting from an automobile accident.  See 2018-NMCA-039, ¶ 25, 420 P.3d at 596.  The Court of Appeals of New Mexico first emphasizes that "[t]he purpose of compensatory damages is to make the injured party whole by compensating it for losses."  Morga, 2018-NMCA-039, ¶ 12, 420 P.3d at 593 (citing Cent. Sec. & Alarm Co., v. Mehler, 1996-NMCA-060, ¶ 11, 121 N.M. 840, 918 P.2d 1340).  The Court of Appeals of New Mexico then notes that the compensatory damages award correctly includes noneconomic damages "including pain and suffering":

> Defendants do not dispute that the non-economic injuries and damages incurred by Plaintiffs are unique, intangible, and difficult to quantify in financial terms.  As such, our judicial system relies on juries and trial courts, as the representatives of their local community, to best evaluate and determine the monetary value of these non-economic injuries, including pain and suffering, and the loss of life.  See James Sandoval, 1998-NMCA-085, ¶¶ 13-14.

Morga, 2018-NMCA-039, ¶ 24, 420 P.3d at 595.  Four years later, in Morga II, the Supreme Court

of New Mexico upholds the jury's award in Morga -- including the noneconomic damages award

-- and rejects the defendants' claim that the disparity between the economic and noneconomic

damages award was "excessive."  Morga II, ¶ 27, 420 P.3d at 785-86.  There, the Supreme Court

of New Mexico affirms that noneconomic damages account "for severe harm that results even

absent pecuniary loss," and notes that "economic loss does not always capture the severity of the

injury in terms of the noneconomic consequences of that injury."  Morga II, ¶ 28, 420 P.3d at 786

(second quote citing Herbert M. Kritzer et al., An Exploration of "Noneconomic" Damages in Civil

Jury Awards, 55 Wm. & Mary L. Rev. 971, 975 (2014).  In Murphy v. United States, No. CIV 17-

0384 JAP/JHR, 2021 U.S. Dist. LEXIS 27641 (D.N.M. 2021)(Eaton, J.), the Honorable Richard

K. Eaton, United States District Judge for the United States Court of International Trade, cites the

noneconomic damages award for pain and suffering in Morga to show that "recent New Mexico

personal injury cases have resulted in jury awards for non-medical damages."  2021 U.S. Dist.

LEXIS 27641 at *11 ("Murphy").   In Murphy, Judge Eaton upholds a medical malpractice

settlement, but explains that the application of New Mexico's $600,000.00 medical malpractice

cap in N.M. Stat. Ann. § 41-5-6(A) has "no bearing on what Plaintiffs could potentially recover

for medical or non-medical damages in a personal injury suit outside the medical malpractice

context."  Murphy, 2021 U.S. Dist. LEXIS 27641 at *10.  Morga and Murphy indicate that New

Mexico State law permits compensatory damages awards to include noneconomic damages for

pain and suffering.  The Court, therefore, predicts that the Supreme Court of New Mexico would

conclude more broadly for common-law tort claims that compensatory damages include

noneconomic damages, such as pain and suffering.  FEMA does not cite any New Mexico tort

cases to the contrary, where the court excludes recovery of noneconomic damages from compensatory damages.

Aside from New Mexico State caselaw, the <u>Dolan</u> Motion lists cases from nearly all of the other fifty States that conclude that actual or compensatory damages includes noneconomic, intangible damages, such as pain and suffering. See <u>Dolan</u> Motion at 44-50.[26] The <u>Dolan</u> Motion also lists cases, see <u>Dolan</u> Motion 44-50,[27] that state that actual or compensatory

---

[26]Citing <u>Guilford v. Weidner Inv. Servs., Inc.</u>, 522 P.3d 1085, 1099 (Alaska 2023); <u>Gorsich v. Double B Trading Co.</u>, 893 P.2d 1357, 1363 (Colo. App. 1994); <u>Campbell-Crane & Assocs., Inc. v. Stamenkovic</u>, 44 A.3d 924, 936 (D.C. 2012); <u>R.J. Reynolds Tobacco Co. v. Grossman</u>, 211 So. 3d 221, 227 (Fla. Dist. Ct. App. 2017); <u>Taylor v. Devereux Found., Inc.</u>, 885 S.E.2d 671, 693 (Ga. 2023); <u>Walston v. Monumental Life Ins. Co.</u>, 923 P.2d 456, 460 (Idaho 1996); <u>Lebron v. Gottlieb Mem'l Hosp.</u> 930 N.E.2d 895, 904 (Ill. 2010); <u>Loparex, LLC v. MPI Release Techs., LLC</u>, 964 N.E.2d 806, 817 (Ind. 2012); <u>Redden v. Gates</u>, 2 N.W. 1079, 1083 (Iowa 1879); <u>Miller v. Johnson</u>, 289 P.3d 1098, 1112 (Kan. 2012); <u>Ragland v. DiGiuro</u>, 352 S.W.3d 908, 917 n. 5 (Ky. Ct. App. 2010); <u>Saunders v. VanPelt</u>, 497 A.2d 1121, 1126 (Me. 1985); <u>Aleo v. SLB Toys USA, Inc.</u>, 995 N.E.2d 740, 745 & n.8 (Mass. 2013); <u>Sherwood v. Chicago & W.M. R. Co.</u>, 46 N.W. 773 (Mich. 1890); <u>Ray v. Miller Meester Advert., Inc.</u>, 684 N.W.2d 404, 407 (Minn. 2004); <u>Sears, Roebuck & Co. v. Learmonth</u>, 95 So. 3d 633, 634 (Miss. 2012); <u>McCormack v. Cap. Elec. Const. Co.</u>, 159 S.W.3d 387, 395 (Mo. Ct. App. 2004); <u>Seltzer v. Morton</u>, 154 P.3d 561, 589 (Mont. 2007); <u>Gourley ex rel. Gourley v. Neb. Methodist Health Sys., Inc.</u>, 663 N.W.2d 43, 80 (Neb. 2003) (Gerrard, J., conc.); <u>Banks ex rel. Banks v. Sunrise Hosp.</u>, 102 P.3d 52, 63 (Nev. 2004); <u>Zahorian v. Russell Fitt Real Estate Agency</u>, 62 N.J. 399, 416 (N.J. 1973); <u>State Div. of Hum. Rts. v. Merante</u>, 343 N.Y.S.2d 378, 379-80 (N.Y. App. Div. 1973); <u>Binstock v. Fort Yates Pub. Sch. Dist. No. 4</u>, 463 N.W.2d 837, 842 (N.D. 1990); <u>McCombs v. Ohio Dep't of Developmental Disabilities</u>, 2022-Ohio-1035, 187 N.E.3d 610, 622, at ¶ 24; <u>Beason v. I. E. Miller Servs., Inc.</u>, 441 P.3d 1107, 1110 (Okla. 2019); <u>Busch v. McInnis Waste Sys., Inc.</u>, 468 P.3d 419, 430 (Or. 2020); <u>Bailets v. Pennsylvania Tpk. Comm'n</u>, 181 A.3d 324, 328 (Pa. 2018); <u>Grieco ex rel. Doe v. Napolitano</u>, 813 A.2d 994, 998 (R.I. 2003); <u>Edwards v. Scapa Waycross, Inc.</u>, 878 S.E.2d 696, 709 (S.C. Ct. App. 2022); <u>Plank v. Heirigs</u>, 156 N.W.2d 193, 203 (S.D. 1968); <u>Meals ex rel. Meals v. Ford Motor Co.</u>, 417 S.W.3d 414, 420 (Tenn. 2013); <u>Crookston v. Fire Ins. Exch.</u>, 817 P.2d 789, 806 (Utah 1991); <u>Travelers Ins. Co. v. Henry</u>, 882 A.2d 1133, 1141 (Vt. 2005); <u>Virginia Kitchen, Bath & Basement, Inc. v. Ellis</u>, 856 S.E.2d 593, 598 (Va. 2021); <u>Beasley v. GEICO Gen. Ins. Co.</u>, 517 P.3d 500, 516 (Wash. Ct. App. 2022); <u>Boyd v. Goffoli</u>, 608 S.E.2d 169, 182 (W. Va. 2004); <u>Miller v. Wal-Mart Stores, Inc.</u>, 580 N.W.2d 233, 241 (Wis. 1998); <u>State Farm Mut. Auto. Ins. Co. v. Shrader</u>, 882 P.2d 813, 833 (Wyo. 1994).

[27]Citing <u>Desert Palm Surgical Grp., P.L.C. v. Petta</u>, 343 P.3d 438, 448 n. 13 (Ariz. Ct. App. 2015); <u>Saunders v. Taylor</u>, 50 Cal. Rptr. 2d 395, 398 (Cal. Ct. App. 1996); <u>DeVito v. Schwartz</u>, 784 A.2d 376, 381 (Conn. App. Ct. 2001); <u>FIE, LLC v. New Jax Condo Ass'n, Inc.</u>, 2017-0423,

damages includes "general damages," which are damages that are "the ordinary result of the conduct alleged." Weyerhaeuser Co. v. Brantley, 510 F.3d 1256, 1266 (10th Cir. 2007). General damages can include pain and suffering damages. See Pahoua Xiong v. Knight Transp.. Inc., 658 Fed. Appx. 884, 888 (10th Cir. 2016)(describing the jury's $282,000 award for pain and suffering as "general damages"). The Court notes these cases show that most often, "actual compensatory damages" includes noneconomic damages such as damages for pain and suffering. The Court, thus, predicts that the Supreme Court of New Mexico, if it is confronted with this issue, would decide that compensatory damages for New Mexico State tort claims include noneconomic damages, such as pain and suffering and loss of enjoyment of life.

### C.    THE HERMIT'S PEAK ACT EXCLUDES ONLY PREJUDGMENT INTEREST AND PUNITIVE DAMAGES.

Immediately following the term "actual compensatory damages," the Hermit's Peak Act states that two categories of damages are unrecoverable: "Any payment under this Act -- . . . shall not include -- (i) interest before settlement or payment of the claim, and (ii) punitive damages." Hermit's Peak Act § 104(c)(3). "Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied, in the absence of a contrary legislative intent." Hillman v. Maretta, 569 U.S. 483, 496 (2013)(citing Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17 (1980))(ellipses added; no ellipses in Hillman v. Maretta or Andrus v. Glover Constr. Co.). In the Hermit's Peak Act, Congress explicitly excludes only two categories of damages: prejudgment interest and punitive damages. See Hermit's Peak Act § 104(c)(3)(B). Nor does

---

p. 13 (La. App. 4 Cir. 02/21/18); 241 So. 3d 372, 387; Cheek v. J. B. G. Properties, Inc., 344 A.2d 180, 187 (Md. Ct. Spec. App. 1975); Blakeley v. Town of Taylortown, 756 S.E.2d 878, 885–86 (N.C. 2014); Hancock v. Variyam, 400 S.W.3d 59, 65 (Tex. 2013)("Actual or compensatory damages ... include general damages (which are non-economic damages such as for loss of reputation or mental anguish) and special damages (which are economic damages such as for lost income).").

FEMA provide evidence of any "contrary legislative intent" to exclude any damages that it did not explicitly enumerate. Hillman v. Maretta, 569 U.S. at 496. Because Congress explicitly enumerates exclusions, the Court declines to imply additional ones, such as an exclusion of noneconomic damages. See Hillman v. Maretta, 569 U.S. at 496. Similarly, "when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." Bostock v. Clayton Cnty., 590 U.S. 644, 669 (2020)("Bostock"). In Bostock, the Supreme Court holds that Title VII of the Civil Rights Act of 1964's prohibition of sex discrimination also includes, rather than excludes, discrimination based on "homosexuality or transgender status." 590 U.S. at 669. See Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000(e)-2(a)(1) (Pub. L. 88-352)("Title VII"). There, a group of employers argue that Title VII's listed protected characteristics of "race, color, religion, sex, and national origin" excludes discrimination based on homosexuality or transgender status. Bostock v. Clayton Cnty., 590 U.S. at 669. Neil Gorsuch, Associate Justice of the Supreme Court, first explains that discrimination based on homosexuality or transgender status "necessarily entails" discrimination based on sex. Bostock v. Clayton Cnty., 590 U.S. at 669. Justice Gorsuch then rejects the group of employers' advocacy for a "'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception." Bostock v. Clayton Cnty., 590 U.S. at 669 (internal quote has no citation). By describing the employer's interpretive theory as a "canon of donut holes," Justice Gorsuch rejects "an interpretive principle that the Court does not recognize as a canon of interpretation." Evan C. Zoldan, Canon Spotting, 59 Hous. L. Rev. 621, 626 (2022). Like the group of employers in Bostock, here, FEMA seeks to impute the interpretive theory that because Congress does not list noneconomic damages as recoverable damages, the Hermit's Peak Act therefore excludes them. See Bostock v. Clayton Cnty., 590 U.S. at 669. The Court rejects

this "canon of donut holes" that reads in additional, unstated exclusions.  Bostock v. Clayton Cnty., 590 U.S. at 669.  Following Bostock's interpretative principles, the Court applies the "broad rule" of allowing the Plaintiffs to recover for "actual compensatory damages," which includes noneconomic damages, and only reads in the explicitly enumerated exceptions of prejudgment interest and punitive damages.   The principle of statutory interpretation expressio unius est exclusio alterius, meaning "[t]he expression of one thing is the exclusion of another," also supports the Court's reasoning.  Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts at 428 (2012)("Scalia & Garner").  "Under the principle of expressio unius est exclusio alterius, the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded."  United States v. Newman, 982 F.2d 665, 673 (1st Cir. 1992)(quoting United States v. Rocha, 916 F.2d 219, 243 (5th Cir. 1990)).  Under the principle of expressio unius est exclusio alterius, the exclusion of prejudgment interest and punitive damages -- but nothing else -- suggests that recoverable damages are all "actual compensatory damages" that the Hermit's Peak Act does not exclude specifically.  See Public Interest Legal Foundation, Inc. v. Bellows, 92 F.4th 36, 48 (1st Cir. 2024)(concluding that, because Congress explicitly carves out two exceptions to the National Voter Registration Act disclosure requirements, 52 U.S.C. § 20507(i)(1), neither into which Maine's electronic voter report falls, "additional exceptions are not to be implied").  All "actual compensatory damages" that Congress does not explicitly exclude in the Hermit's Peak Act, therefore, includes noneconomic damages.

Additionally, at the Hearing, the Plaintiffs willingly conceded that statutory damages are not recoverable.  See Hearing Tr. 28:25-29:2 (Siminou)("I think that's FEMA's point, that actual compensatory damages don't include statutory damages.  I would agree with that").  The Court sees no reason to go further than what the statute clearly excludes and what the Plaintiffs willingly

concede they cannot recover. The Court declines to identify even more damages categories that the Hermit's Peak Act excludes than what it says are excluded. Because the term "actual compensatory damages" includes noneconomic damages, and because noneconomic damages such as damages for emotional pain and suffering are not in the list of explicitly excluded damages, the Court concludes that the Hermit's Peak Act allows the Plaintiffs to recover for noneconomic damages.

## IV.    THE ALLOWABLE DAMAGES PROVISION, § 104(D)(4), IS A NONEXHAUSTIVE LIST OF RECOVERABLE LOSSES FOR PROPERTY, BUSINESS, AND FINANCIAL LOSS.

To support the conclusion that the Hermit's Peak Act does not allow recovery of noneconomic damages, FEMA focuses on the Allowable Damages provision, which lists three categories of allowable damages: loss of property, business loss, and financial loss. See Hermit's Peak Act § 104(d)(4). FEMA argues that this list is exclusive: because noneconomic damages are not on the list, they are not recoverable. See Dolan Response at 21. To the contrary, the Plaintiffs argue that the Court should read the list of property, business, and financial losses as nonexclusive. See Dolan Reply at 12. The Allowable Damages provision states that a claim "may" include "otherwise uncompensated" damages from the losses of property, business, and financial "resulting from the Hermit's Peak/Calf Canyon Fire for --," and then goes on to list specific losses within each category. See § 104(d)(4)(A)-(C). For example, an injured person can file a claim for "otherwise uncompensated damages" for "an uninsured or underinsured property loss", a claim for an "otherwise uncompensated business loss" such as "[d]amage to tangible assets or inventory, including natural resources"; or a claim for an "otherwise uncompensated financial loss" for "[e]mergency staffing expenses." Hermit's Peak Act § 104(d)(4)(A)-(B). The Court concludes that the term "allowable damages" within the provision's context suggests that the loss of property,

business, and financial loss are nonexclusive.  They are in addition to those recoverable under New Mexico state law because the Allowable Damages Provision, § 104(d)(4), describes the listed damages as ones resulting from the Hermit's Peak/Calf Canyon Fire that are "otherwise uncompensated" under the Hermit's Peak Act.  Hermit's Peak Act § 104(d)(4).

A.    **PLAINTIFFS CAN ADDITIONALLY, NOT EXCLUSIVELY, RECOVER THE LISTED DAMAGES IN THE ALLOWABLE DAMAGES PROVISION, § 104(D)(4), BECAUSE THEY ARE "OTHERWISE UNCOMPENSATED" UNDER THE HERMIT'S PEAK ACT.**

First, the Allowable Damages provision's list of property, business, and financial losses as damages that are "otherwise uncompensated" under the Hermit's Peak Act suggests that such damages are additionally recoverable under the Hermit's Peak Act.  This language indicates that a different primary provision in the Hermit's Peak Act compensates victims of the Hermit's Peak/Calf Canyon Fire, and the listed "otherwise uncompensated" damages for property, business, and financial losses complement the primary provision's allowable damages.  That different provision can be none other than the NM State law provision, § 104(c)(2), which allows recovery of damages that are available under New Mexico State law, such as noneconomic damages.  Since FEMA's primary argument is that the Allowable Damages provision is the only provision that states the recoverable damages, it does not point to any different provision that otherwise compensates victims of the Hermit's Peak/Calf Canyon Fire.  Reading the Hermit's Peak Act as only allowing recovery of damages for the specifically listed property, business, and financial losses in the Allowable Damages provision is irreconcilable with the provision's description of them as "otherwise uncompensated."  Hermit's Peak Act § 104(d)(4).

FEMA's reading of the Allowable Damages provision requires the Court to imply, within the meaning of "allowable," a limitation on the damages that does not exist.  Congress did not say that "allowable" damages are "exclusive" damages; rather, "allowable damages" provides

categories of damages that the Plaintiffs "may" recover.  Hermit's Peak Act § 104(d)(4).  Given the context that the Allowable Damages provision treats damages from property, business, and financial losses as "otherwise uncompensated" under the Hermit's Peak Act, this meaning of "allowable" makes the most sense.  Here, the Allowable Damages provision's use of the word "allowable" is more like the word "permissive" than the word "exclusive."  Bryan A. Garner, Black's Law Dictionary (12th ed. 2024)(defining "permissive" as "Recommending or tolerating, but not compelling or prohibiting; giving power of choice").   There is also no express limiting language in the Allowable Damages provision.  The list of damages under § 104(d)(4) is a list of permissive damages; it is not an exclusive list of damages, nor is it a limit on the damages that the Plaintiffs can recover.  Furthermore, the Allowable Damages provision states that a plaintiff's claim "may" include "otherwise uncompensated damages resulting from the Hermit's Peak/Calf Canyon Fire."  Hermit's Peak Act § 104(d)(4)(A).  In contrast to the word "shall," "may" is "generally used to indicate a permissive provision, ordinarily implying some degree of discretion." Shall, Legal Information Institute Wex Definitions, https://www.law.cornell.edu/wex/shall (last updated August 2021).  The use of "may," as opposed to "shall only," "must only," or "is limited to," indicates clearly that the provision's listed damages are permissive and not exclusive.  None of the Allowable Damages provision's language indicates that the listed property, business, and financial losses are a closed universe of recoverable damages.

Principles of statutory interpretation affirm the Court's reading of the listed property, business, and financial losses in the Allowable Damages provision as "otherwise uncompensated," i.e., as nonexclusive of the damages recoverable under the Hermit's Peak Act.  The Supreme Court first recognizes a presumption against rendering language superfluous in the landmark case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174 (1803)("It cannot be presumed that any clause in

the [C]onstitution is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it.")(brackets added).  This presumption against superfluity, also known as the "Surplusage Canon," requires that, "if possible, every word and every provision is to be given effect.  None should be ignored.  None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."  Scalia & Garner, supra at 174.  Further, "because legal drafters should not include words that have no effect, courts avoid a reading that renders some words altogether redundant."  Scalia & Garner, supra at 176.  Here, under the presumption of superfluity, the Court accords legal significance to every phrase in the Allowable Damages provision, § 104(d)(4).  See Scalia & Garner, supra at 174.  FEMA's position that the Allowable Damages provision allows recovery exclusively for property, business, and financial loss would render the description of those losses as "otherwise uncompensated" in § 104(d)(4) redundant.  The provision's phrase "otherwise uncompensated" would have no effect, and Congress could have left it out altogether.  On the other hand, reading the property, business, and financial losses as recoverable in addition to those losses "otherwise uncompensated" under New Mexico State law per § 104(c)(2), gives independent effect to every word and phrase within § 104(d)(4).  The Court, therefore, reads the Allowable Damages provision § 104(d)(4) with a presumption against superfluity.

FEMA argues that interpreting the Allowable Damages provision, § 104(d)(4), as "supplementing" the damages recoverable under New Mexico law renders the provision superfluous, because New Mexico State law already allows recovery for damages resulting from the listed property, business, and financial loss.  Dolan Response at 21.  FEMA, however, does not cite any New Mexico State law that provides recovery for all of the listed losses in § 104(d)(4) that may be "otherwise uncompensated" under the Hermit's Peak Act.  Nor could it.  The Court is not

able to find, for example, any New Mexico State law that specifically here provides recovery for uninsured property loss, § 104(d)(4)(A)(i), for an unrealized decrease in the value of real property, § 104(d)(4)(A)(ii), or for damage to acequia systems,[28] § 104(d)(4)(A)(iii).  See Hermit's Peak Act § 104(d)(4).  Nor is the Court able to find any New Mexico State law that specifically here provides recovery of financial losses from paying an insurance deductible, § 104(d)(4)(C)(ii); of financial losses from reasonable efforts to reduce wildfire, flood, and other natural disaster risk by the impacted counties, § 104(d)(4)(C)(vii); or of financial losses greater than are recoverable under a Small Business Administration disaster assistance loan, § 104(d)(4)(C)(ix).  See Hermit's Peak Act § 104(d)(4).  The Court adheres to the presumption against superfluity to read the Allowable Damages provision,  § 104(d)(4), as allowing recovery for property, business, and financial losses for what New Mexico State law otherwise does not compensate under the NM State law provision, § 104(c)(3).

      **B.**    **THE ALLOWABLE DAMAGES PROVISION, § 104(D)(4), HAS CATCH-ALL PROVISIONS THAT ALLOW FOR BROAD RECOVERY OF DAMAGES RESULTING FROM LOSS OF PROPERTY, BUSINESS LOSS, AND FINANCIAL LOSS.**

Second, FEMA also argues that the catch-all provisions within the Allowable Damages provision, § 104(d)(4), apply only to damages resulting from property, business, and financial losses.  See Lands Response at 20.  The Plaintiffs argue that the catch-all provisions authorize the FEMA administrator or manager to add as damages for property, business, and financial loss, broader damages such as noneconomic damages.  Lands Motion at 21.  See Hermit's Peak Act

---

[28]Acequias are community irrigation systems in the villages and Pueblos of New Mexico.  The New Mexico Legislature has provided that acequias are "political subdivisions" or local government entities with all the attendant rights and responsibilities.  See Brigette Buynak, Esq. & Jerold Widdison, Acequias, University of New Mexico Utton Center (2017), https://uttoncenter.unm.edu/resources/research-resources/acequias.pdf (last visited November 25, 2024).

§ 103(1)(defining "Administrator" as an administrator of FEMA).  The Hermit's Peak Act's

Allowable Damages provision has a "catch-all" category of damages for each of property,

business, and financial losses:

> (A)    LOSS OF PROPERTY. -- A claim that is paid for the loss of property under
> this Act may include otherwise uncompensated damages resulting from the
> Hermit's Peak/Calf Canyon Fire for --
>
>> (vi)    any other loss that the Administrator determines to be appropriate
>> for the inclusion as loss of property.
>
> (B)    BUSINESS LOSS. -- A claim that is paid for injury under this Act may
> include damages resulting from the Hermit's Peak/Calf Canyon Fire for the
> following types of otherwise uncompensated business loss:
>
>> (vi)    any other loss that the Administrator determines to be appropriate
>> for the inclusion as business loss.
>
> (C)    FINANCIAL LOSS. -- A claim that is paid for injury under this Act may
> include damages resulting from the Hermit's Peak/Calf Canyon Fire for the
> following types of otherwise uncompensated financial loss:
>
>> (x)    Any other loss that the Administrator determines to be appropriate
>> for inclusion as financial loss.

Hermit's Peak Act §§ 104(d)(4)(A)(vi), 104(d)(4)(B)(vi), 104(d)(4)(C)(x)(the "catch-all

provisions").  The Court agrees with FEMA and concludes that the plain language shows that the

broader categories of property, business, and financial loss limit the catch-all provisions, as

opposed to the catch-all provisions providing for recovery of damages that go beyond those

categories.  See Hermit's Peak Act § 104(d)(4)(A)(vi); § 104(d)(4)(B)(vi); § 104(d)(4)(C)(x).  The

catch-all provisions state that the Administrator must determine that "any other loss" be

"appropriate for inclusion as" one of the three listed categories, Hermit's Peak Act

§ 104(d)(4)(A)(vi); § 104(d)(4)(B)(vi); § 104(d)(4)(C)(x), which means "any other loss" that is

"appropriate for inclusion" from within one of the three listed categories.  The ejusdem generis

canon, meaning "of the same kind or class," also supports a narrow interpretation of the catch-all

provisions.  Scalia & Garner, supra at 428.  "The rule of ejusdem generis . . . limits general terms which follow specific ones to matters similar to those specified."  Gooch v. United States, 297 U.S. 124, 128 (1936).  Applying this principle here, the Allowable Damages provision sets out three categories of damages and ends each category with a general catch-all provision.  Hermit's Peak Act § 104(d)(4).  Applying the ejusdem generis canon, the general catch-all provisions are limited to the preceding specific damages categories of property, business, and financial losses.

Nevertheless, the conclusion that the Allowable Damages provision limits the scope of its underlying catch-all provisions is immaterial to whether the Hermit's Peak Act allows recovery of noneconomic damages.  Rather, the NM State law provision, § 104(c)(2), waives sovereign immunity for claims under New Mexico State law, and the Extent of Damages provision, § 104(c)(3), excludes only prejudgment interest and punitive damages from "actual compensatory damages," and does not exclude noneconomic damages.  A nearsighted focus on the Allowable Damages provision's catch-all sub-provisions overlooks these two important provisions which allow the Plaintiffs to recover noneconomic damages under the Hermit's Peak Act.

## V.   BECAUSE THE ONLY SOUND INTERPRETATION OF THE HERMIT'S PEAK ACT IS THAT IT ALLOWS RECOVERY OF NONECONOMIC DAMAGES, THE COURT DOES NOT NEED TO CONSTRUE LANGUAGE AS AMBIGUOUS IN FAVOR OF IMMUNITY.

FEMA argues that any waiver of sovereign immunity in the Hermit's Peak Act is not "unequivocally expressed," and therefore, the Court must construe sovereign immunity.  Dolan Response at 13 (citing United States v. Nordic Village, Inc., 503 U.S. 30, 33 (1992)).  "As a sovereign, the United States is generally immune from suits seeking money damages unless Congress chooses to waive that immunity."  Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz, 601 U.S. 42, 42 (2024).  To determine whether Congress has chosen to waive sovereign immunity, the Court applies a "clear statement" rule, permitting suit against the United States only when "the

language of the statute" is "unmistakably clear" in allowing it. <u>Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz</u>, 601 U.S. at 42 (citing <u>Kimel v. Florida Bd. of Regents</u>, 528 U. S. 62, 73 (2000)). Further:

> ambiguities in the statutory language are to be construed in favor of immunity, <u>United States v. Williams</u>, 514 U.S. 527, 531 (1995), so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires, <u>Ruckelshaus v. Sierra Club</u>, 463 U.S. 680, 685-686 (1983)(citing <u>Eastern Transp. Co. v. United States</u>, 275 U.S. 675, 686 (1927)).

<u>F.A.A. v. Cooper</u>, 566 U.S. 284, 290 (2012)("<u>F.A.A. v. Cooper</u>"). "Ambiguity exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government." <u>F.A.A. v. Cooper</u>, 566 U.S. at 290-91. Here, the Court concludes that no ambiguity exists in the Hermit's Peak Act because all of the relevant provisions waive the United States' sovereign immunity against recovery of noneconomic damages. First, all plausible interpretations of the Hermit's Peak Act's NM State law provision, § 104(c)(2), authorize recovery from the United States for noneconomic damages available under Mexico State law. Second, the Extent of Damages provision, § 104(c)(3), indicates that the recoverable "actual compensatory damages" includes noneconomic damages, based on the purpose of the Hermit's Peak Act, the Hermit's Peak Act's functional parallel to the FTCA, and the explicit exclusion of only prejudgment interest and punitive damages. Third, the Allowable Damages provision, § 104(d)(4), lists damages recoverable in addition to those recoverable under New Mexico State law per § 104(c)(2), and those recoverable as "actual compensatory damages" per § 104(c)(3). Rather than limiting the United States' waiver of sovereign immunity to the damages for the listed property, business, and financial loss, the Allowable Damages provision expands the waiver of sovereign immunity to include additionally those damages. In the Hermit's Peak Act, waiver of sovereign immunity for

noneconomic damages is unmistakably clear and the statutory language has no ambiguity.  The

Court, therefore, does not construe the Hermit's Peak Act in favor of sovereign immunity.

VI.    **THE COURT HOLDS UNLAWFUL AND SETS ASIDE FEMA'S REGULATION THAT DOES NOT ALLOW RECOVERY FOR NONECONOMIC DAMAGES, AND COMPELS FEMA TO ADJUDICATE THE PLAINTIFFS' CLAIMS FOR NONECONOMIC DAMAGES RESULTING FROM THE HERMIT'S PEAK/CALF CANYON FIRE.**

The Plaintiffs request that the Court, first, hold unlawful and set aside FEMA's regulation

precluding the recovery of their noneconomic damages under the APA, 5 U.S.C. § 706(2)(A) and

(C).  See Lands Motion at 2.  Second, the Plaintiffs ask the Court to compel FEMA to adjudicate

their claims for noneconomic damages under 5 U.S.C. § 706(1).  See Lands Motion at 2.  In

conducting a de novo APA review of the Hermit's Peak Regulation under Loper Bright, the Court

first concludes that the Hermit's Peak Regulation which precludes recovery of noneconomic

damages is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2), and thus holds the

relevant Hermit's Peak Regulation unlawful and sets it aside.  Second, the Court then concludes

that FEMA's determination to not award noneconomic damages is an agency action that is

"unlawfully withheld" under the APA, 5 U.S.C. § 706(1), and thus compels FEMA to award

noneconomic damages.

A.    **THE HERMIT'S PEAK REGULATION IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE APA, 5 U.S.C. § 706(2).**

Under the APA, when an agency action is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with the law," the court shall "hold unlawful and set aside" the agency

action.  5 U.S.C. § 706(2)(A).  See U.S. Magnesium, LLC v. EPA, 690 F.3d 1157, 1164 (10th Cir.

2012)(explaining that, under 5 U.S.C. § 706, a court may not set aside agency action "unless it is

procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute").

Here, FEMA's Hermit's Peak Regulation precluding recovery of noneconomic damages is

arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). FEMA's conclusion that the Hermit's Peak Act does not allow recovery of noneconomic damages contravenes the language of the Hermit's Peak Act and misapplies principles of statutory interpretation in several ways. First, the Court concludes that the Hermit's Peak Act waives the United States' sovereign immunity for damages recoverable under New Mexico State law, because the Hermit's Peak Act NM State law provision incorporates damages that are recoverable under New Mexico State law by stating that "the laws of the State of New Mexico shall apply to the calculation of damages under [the Allowable Damages Provision, § 104](d)(4)." Hermit's Peak Act § 104(c)(2). Moreover, the Hermit's Peak/Calf Canyon Fire is a private nuisance and a trespass under New Mexico State law, and the Court concludes that noneconomic damages are recoverable for private nuisance and trespass. The Court also concludes that noneconomic damages are recoverable for personal injury claims under New Mexico State law. The Plaintiffs, therefore, can recover noneconomic damages for private nuisance, trespass, and personal injury claims resulting from the Hermit's Peak/Calf Canyon Fire. Second, the Hermit's Peak Act's Extent of Damages provision, § 104(c)(3), which states that damages are limited to "actual compensatory damages," includes noneconomic damages based on the Hermit's Peak Act's purpose, the intentional parallel intent with the FTCA, consistency with the New Mexico State courts' definition of compensatory damages, and a plain reading of the statute's language that only explicitly includes prejudgment interest and punitive damages. The Court concludes, therefore, that FEMA's Hermit's Peak Regulation contravenes the statute's plain reading, principles of statutory interpretation, and New Mexico State law and caselaw. The relevant Hermit's Peak Regulation, therefore, is arbitrary and capricious, making it unlawful, and the Court sets it aside.

**B.    THE COURT COMPELS FEMA TO AWARD NONECONOMIC DAMAGES BECAUSE FEMA UNLAWFULLY WITHHOLDS SUCH DAMAGES IN VIOLATION OF THE APA, 5 U.S.C. § 706(1).**

FEMA contends that, if the Court construes the Hermit's Peak Act as permitting noneconomic damages, the Court should remand the Plaintiffs' claims to FEMA for further determination.  See Dolan Response at 20 n. 4.  When an agency decision is "potentially lawful but insufficiently or inappropriately explained," courts frequently remand "for further explanation (including discussion of relevant factors and precedents) while withholding judgment of the lawfulness of the agency's proposed action."  Radio-Television News Directors Ass'n v. F.C.C., 184 F.3d 872, 888 (D.C. Cir. 1999).  See, e.g., Friends of the Floridas v. United States Bureau of Land Management, -- F. Supp. 3d --, 2024 WL 3952037, at *86 (D.N.M. August 27, 2024)(Browning, J.)(remanding the Bureau of Land Management's decision to approve a mining project, because the Bureau of Land Management "may be able to provide a reasonable explanation").  If, however, the agency decision -- like a rulemaking -- results in the agency's refusal to take action, the court may compel an agency to take such action if it is "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).  Here, the Court concludes that FEMA's Hermit's Peak Regulation that precludes recovery of noneconomic damages is unlawful and sets it aside under 5 U.S.C. § 706(2)(A).  FEMA's decision not to allow noneconomic damage awards, therefore, constitutes an agency action that is "unlawfully withheld" under 5 U.S.C. § 706(1).  The Court sees no sound reason to remand the Plaintiffs' claims to FEMA for further determination after concluding that the Hermit's Peak Act allows recovery of noneconomic damages, and that FEMA's Hermit's Peak Regulation precluding recovery of noneconomic damages is unlawful. The Court compels FEMA to award noneconomic damages for the Plaintiffs' claims, such as for emotional pain and suffering, under the Hermit's Peak Act.  See 5 U.S.C. § 706(1).

UNITED STATES DISTRICT JUDGE

*Counsel:*

Antonia Roybal-Mack
Cynthia Weisman
Mark Dow
Bauman & Dow, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiff Charles William Paynter*

Thomas Tosdal
Tosdal Law Firm
Solana Beach, California

-- and --

Ty Tosdal
Tosdal APC
San Diego, California

    *Attorneys for the Plaintiff Marianna Lands*

Joe Lovell
Lovell Hoffman Law, PLLC
Amarillo, Texas

    *Attorney for the Plaintiff Kathy Valera*

Krystle D. Berkstresser
Alicia Zimmerman
Jonna D. Lothyan
Gerald Singleton
Benjamin Siminou
Singleton Schreiber
San Diego, California

-- and --

Jesse Gallegos
Jacob Payne
Brian Colon
Singleton Schreiber
Albuquerque, New Mexico

>*Attorneys for the Plaintiffs Tobin Dolan, Lydia Dolan, Tangee Dolan, Dorothy Jones, Brian Rodgers, Barbara Rodgers, Michael Salazar, Linda Salazar, Reynaldo Herrera, and Kathy Valera*

Brett Eaton
Nicholas Sydow
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

>*Attorneys for the Defendants*